```
 1                 UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF UTAH CENTRAL DIVISION

 3

 4   * * * * * * * * * * * * * * * *
                                    *
 5   CHARLES YOUNG,                 *
                                    *
 6          Plaintiff,              *
                                    *  Case Number: 2:23-cv-00420-TS
 7   v.                             *
                                    *  Judge Ted Stewart
 8   MOUNTAIN LAND COLLECTIONS,     *
     et. al,                        *
 9                                  *
            Defendant.              *
10                                  *
     * * * * * * * * * * * * * * * *
11

12

13

14

15                    30(b)(6) DEPOSITION OF

16                   Mountain Land Collections

17                         Quinn Kofford

18                        April 23, 2024

19

20
                    CONTAINS CONFIDENTIAL TESTIMONY
21

22

23

24
            Reported by:   Spencer Von Jarrett, RPR No. 993793
25
```

CERTIFIED COPY

Page 2

1  Deposition of Quinn Kofford, taken on April 23, 2024 at 10:00 a.m.
2  at the offices of JD Legal Support located at 2901 W. Bluegrass
3  Blvd., Ste. 200, Lehi, UT 84043, before Spencer Von Jarrett,
4  Certified Court Reporter, in and for the State of Utah.
5
6             A P P E A R A N C E S
7  Eric Stephenson (9779)
   STEPHENSON LAW FIRM
8  250 North Redcliffs Drive, 4B #254
   Saint George, Utah 84790
9  ericstephenson@utahjustice.com
   Attorney for Plaintiff
10
11 David Grassi
   FROST ECHOLS LLC
12 224 Oakland Avenue
   Rock Hill, SC 29730
13 david.grassi@frostechols.com
   Attorney for Defendant Mountain Land Collections
14
15 Christopher Hill
   KIRTON McCONKIE
16 36 S. State St., Ste. 1900
   Salt Lake City, UT 84111
17 CHill@kmclaw.com
   Attorney for the Defendants, except Mountain Land Collections

Page 3

1                 I N D E X
   WITNESS: Quinn Kofford
2
   EXAMINATION                                          PAGE
3
       By: Mr. Stephenson                                  4
4
       By: Mr. Grassi                                    102
5
6
7
                  E X H I B I T S
8
9  NUMBER         DESCRIPTION                           PAGE
10 EXHIBIT 1      Notice of Deposition                     5
   EXHIBIT 2      Debt$Net Records                        32
11 EXHIBIT 3      Phone Records                           37
   EXHIBIT 4      Debtor Contact List                     38
12 EXHIBIT 5      Consolidated Debt$Net Notes             39
   EXHIBIT 6      Complaint                               40
13 EXHIBIT 7      Default Judgment                        50
   EXHIBIT 8      Application for Writ of Execution       52
14 EXHIBIT 9      Writ of Execution                       52
   EXHIBIT 10     Constable Letter, Writ of Execution     70
15 EXHIBIT 11     Constable Letter, Sale Notice           76
   EXHIBIT 12     Constable Letter                        86
16 EXHIBIT 13     Constable Letter                        87
   EXHIBIT 14     Constable Letter                        87
17 EXHIBIT 15     Constable Letter                        87
   EXHIBIT 16     Constable Letter                        88
18 EXHIBIT 17     Constable Letter                        88
   EXHIBIT 18     $84 Payments                            89
19 EXHIBIT 19     $167 Payment                            90
   EXHIBIT 20     Mountain Land Transaction List          91

Page 4

1                  P R O C E E D I N G S
2          [On the record at 10:03 a.m.]
3          [Appearances noted.]
4                  QUINN KOFFORD,
5      a witness herin, having been administered an oath,
6          was examined and testified as follows.
7                   EXAMINATION
8  BY MR. STEPHENSON:
9     Q.   Okay.  Will you state your name for the record.
10    A.   My name is Quinn Kofford, often mispronounced Kaufford.
11    Q.   And you're here on behalf of Mountain Land Collections,
12 correct?
13    A.   Correct.
14    Q.   Okay.  I'm a little distracted by the traffic noise, so
15 you'll forgive me if I take a sec.
16    A.   You bet.
17    Q.   Okay.  And for Mountain Land Collections, tell me your
18 position there.
19    A.   I am the manager and a member of the LLC.
20    Q.   And are there other members of the LLC?
21    A.   One other, yes.
22    Q.   Who is that?
23    A.   Seiler Capital [phonetic].
24    Q.   How much of a percentage do you own compared to Seiler
25 Capital?

Page 5

1     A.   53 to 47; I'm 53 percent.
2     Q.   And who owns Seiler Capital?
3     A.   I don't know.  I can tell you the manager is.
4     Q.   Who is the manager?
5     A.   Shawn Olsen.
6     Q.   Okay.  And the reason I ask that is because I want to
7  make sure that the record is clear that you're here to answer
8  questions on behalf of Mountain Land Collections, right?
9     A.   That is correct.
10    Q.   Okay.  So I'm going to hand you what's marked as Exhibit
11 1.
12         [Exhibit 1 Marked]
13         And again, I apologize to the counsel here that I don't
14 have copies.  Everyone knows what it is, so it should be okay.  I
15 don't even have a copy for me.
16         So do you recognize the document I've handed you?
17    A.   I do.
18    Q.   And what is the document?
19    A.   That is the second amended notice of today's deposition
20 of Mountain Land Collections.
21    Q.   Okay.  And have you read through that and looked at the
22 topics?
23    A.   I have.
24    Q.   Are you prepared to discuss those topics today?
25    A.   I am.

Page 6

1  Q. Are there any topics in there you're not prepared to
2  discuss?
3  A. No. I'm prepared to discuss all, subject to
4  recommendations from counsel, my counsel, Mountain Land's counsel.
5  Q. Yes. We have an agreement that you'll have a -- I'll
6  make sure I get this right -- some basic understanding of the
7  topics, but you won't have -- you didn't prepare for details of
8  some of the numbers we're asking for.
9  A. Correct.
10 Q. Okay. What did you do to prepare for today's
11 deposition?
12 A. I reread all of the discovery pleadings that Mountain
13 Land prepared in this matter, all of the documents that were
14 produced.
15     I re-reviewed Mountain Land's file on Mr. Young, and I
16 met with counsel.
17 Q. Okay. And Mountain Land's file on Mr. Young, does that
18 contain any documents that have not been produced in discovery?
19 A. No, sir.
20 Q. And let's just get this out of the way now.
21     Monday, yesterday morning -- I think it was yesterday
22 morning -- I was given a document in discovery.
23     Do you know what that was?
24 A. If you wouldn't mind refreshing my memory, I do. I'm
25 just drawing a morning blank.

Page 7

1  Q. That's totally fine. I don't have a copy of it because
2  it was given to me at a time when I was out of the office.
3     It was an information sheet.
4  A. Oh, yes. Yes. Thank you.
5  Q. Can you tell me what that was?
6  A. So in my review, one of the things that occurred to me
7  that we had not produced was the actual writ of execution that was
8  given to the constable. And so that was correcting that error.
9  Q. And the first page of that document -- and I hate to ask
10 questions about a document we don't have, but we're going to have
11 no choice because it was produced yesterday -- I think it was
12 yesterday. Anyway, whatever day it was produced, it was not
13 within enough time for me to print it and have it ready.
14     Is that a normal document you give to the constables?
15 A. It is. We call it a writ packet.
16 Q. A writ packet, okay. Thank you.
17     So one of the things to be worried -- we're not worried
18 about -- but aware of: sometimes I will say "you" instead of
19 Mountain Land. I usually mean Mountain Land, is that okay?
20 A. Yeah. In fact, if I say "I", I also mean Mountain Land.
21 Q. And if there's any specific questions directed at you,
22 Quinn Kofford, I will probably clarify that. It gets confusing,
23 but it is part of what we do.
24 A. Great.
25 Q. Okay. And if you do have any confusion or any concerns

Page 8

1  about what I'm asking, just let me know. I'll be happy to
2  rephrase.
3  A. You bet. Thank you.
4  Q. Okay. So what is it that Mountain Land does as a
5  business model?
6  A. We collect debts.
7  Q. Okay. Does Mountain Land do anything other than collect
8  debt to generate revenue specifically?
9  A. No.
10 Q. Okay. There's two ways to do this. And we need to
11 establish that Mountain Land collections is a debt collector under
12 the FDCPA.
13     I can go through four pages of questions or we can just
14 ask you the question.
15     Do you believe that Mountain Land collections is a debt
16 collector under the FDCPA?
17     MR. GRASSI: Objection, legal conclusion.
18     Go ahead.
19     THE WITNESS: Answer it?
20     MR. STEPHENSON: Yep.
21 A. Depending on the context, yes.
22 Q. Okay. In the context of collecting the debt from my
23 client, is that one of the contexts where it counts as a debt
24 collector?
25 A. Pre- or post-judgment?

Page 9

1  Q. Post-judgment.
2  A. No.
3  Q. Okay. Can you explain why that is?
4  A. Our belief is that once a judgment is obtained, the
5  nature of the debt changes and we become a judgment creditor. And
6  the original debt has been absorbed in the judgment itself.
7  Q. Okay. But Mountain Land regularly does collect
8  judgments after they're rendered, correct?
9  A. Yes, we collect on those judgments.
10 Q. Okay. And Mountain Land obtained -- let's just go
11 through these to make sure we're good.
12     And the judgments -- let's see, so Mountain Land
13 collections is collecting debts before the judgment is rendered;
14 it's collecting debts for other companies, correct?
15 A. We are collecting debts that originated with other
16 companies.
17 Q. Right. And they are assigned to Mountain Land after
18 they fall past due.
19 A. Correct.
20 Q. And then Mountain Land -- we're jumping way ahead if I
21 go there. Let's not do that yet.
22     Okay. Mountain Land is not a lender?
23 A. No, sir.
24 Q. And I'm not asking the number; I just want to know what
25 percentage of your annual gross revenue comes from suing consumers

Page 54

1  A.  Give me the number again?
2  Q.  1,316.
3  A.  Yes, that's sounding about right.
4  Q.  Okay. And if it's not exact, I'm not --
5      MR. GRASSI: Yeah, I would have answered the question
6  approximately 1,300, so we're close.
7  Q.  Yeah. So how many of those writs were sent to -- well,
8  which constables do you send writs of execution to?
9  A.  Utah County Constables is who we use.
10 Q.  And that is Michael Erickson?
11 A.  Our understanding is Utah County Constables includes
12 Erickson.
13 Q.  Does it also include Kolkman?
14 A.  That's our understanding, yes.
15 Q.  Do you use any other constables; did you deliver writs
16 of execution to any other constables in that time period?
17 A.  Give me the time period again.
18 Q.  In 2022, 2023, and 2024?
19 A.  Yes.
20 Q.  Okay. And who were those other constables?
21 A.  John Sindt.
22 Q.  How many did you send to John Sindt in that same --
23 A.  It's going to be all part and parcel of that number.
24 Q.  John Sindt is part of Utah County Constables?
25 A.  That's our belief, yes.

Page 55

1  Q.  Is it your belief that John Sindt is a constable?
2  A.  Yes.
3  Q.  Does he hold himself out as a constable?
4  A.  Yes.
5  Q.  Does he hold himself out as a constable in Utah County?
6  A.  I believe so, yes.
7  Q.  Is John Sindt serving the writ of executions that you
8  sent him?
9  A.  I don't know.
10 Q.  Do you know if John Sindt is holding himself out as a
11 constable to your debtors?
12 A.  I don't know.
13 Q.  Other than Erickson, Kolkman, and Sindt, are there any
14 other constables you deliver writs of execution to?
15 A.  No.
16 Q.  And when did you start sending writs of -- excuse me,
17 delivering writs of execution to Utah County Constables?
18 A.  I would -- it goes back into the 90s, I believe.
19 Q.  And back in the 90s, do you know if it was all three,
20 Erickson, Kolkman, and Sindt?
21 A.  I believe it was only Sindt.
22 Q.  So in your mind, you never stopped sending writs of
23 execution to Erickson and went to Kolkman; in your mind, it's the
24 same company?
25 A.  Yes and no. May I explain?

Page 56

1  Q.  Yes, please.
2      [The following testimony was deemed confidential.]
3  A.  I'm trying to be very sensitive here. We learned about
4  a potential MS diagnosis of Erickson.
5  Q.  Yes.
6  A.  Whether he continued or not, I don't know. I do not
7  believe he did.
8      MR. HILL: And I'm going to --
9      MR. STEPHENSON: No, you're not.
10     MR. HILL: You don't have the right to stop me. I can
11 designate that as confidential in the transcript.
12     MR. STEPHENSON: Okay.
13 A.  I don't know if Erickson would want it getting out he's
14 got MS.
15 Q.  It's not going to get out from me.
16     MR. HILL: And I will again add that caveat to the
17 confidential -- and the supplemental response as well.
18     [End of confidential testimony.]
19 Q.  When do you typically send writs of execution to the
20 constables?
21 A.  After they're issued by the court.
22 Q.  Is there a specific day of the week that they get a
23 batch of them, or do you send them individually?
24 A.  No. We send them in batches a couple times a month.
25 Q.  And when you say a couple times a month, I want to be

Page 57

1  specific. Is it only two times?
2  A.  I believe it's only two times a month.
3  Q.  Okay. And is it two times every month, routine?
4  A.  There's no set routine, but more or less, yes.
5  Q.  Is there a specific number you wait until you get enough
6  of them to send them over?
7  A.  No.
8  Q.  Just figure every couple of weeks you should send some
9  over?
10 A.  Yes.
11 Q.  Do you know how many in a batch you normally send?
12 A.  It's going to vary. I don't know the exact number, but
13 it's going to vary from 10 to 30, or however the math adds up.
14 Q.  And you mentioned earlier that once you deliver a writ
15 of execution to the constables, you don't know what happens next.
16 A.  That is correct.
17 Q.  And do you make any attempts to ever discover what
18 happens next?
19 A.  No.
20 Q.  ==What do you expect them to do when you deliver a writ to
21 the constables?==
22 A.  ==Execute on the writ of execution.==
23 Q.  And you expect the constables to execute 100 percent of
24 the writs you deliver to them?
25 A.  That would be our hope, yes.

Page 58

1  Q.  After you deliver the writs to the constables, they
2  periodically send you payments, correct?
3  A.  Yes.
4  Q.  And do you ever inquire where those payments come from?
5  A.  No.
6  Q.  They indicate to you what account or what judgment the
7  payment applies to, though?
8  A.  Yes.
9  Q.  So you know that you're receiving money from the
10 constables that they collected from the judgment debtor?
11 A.  Yes.
12 Q.  But you don't know the method they're using to collect
13 those payments?
14 A.  No, we do not.
15 Q.  When the constables send you the payments, do they ever
16 send you a certificate of sale?
17 A.  No.
18 Q.  And you said that you've been using the constables since
19 the 1990s.  And in all that time you've never received even one
20 certificate of sale?
21 A.  Not that I can recall.
22 Q.  Are you aware of any sales that they've held to collect
23 the debt for you?
24 A.  Not that I'm aware.
25 Q.  Have you ever asked the constables, "Are you holding

Page 59

1  sales?"
2  A.  No.
3  Q.  Do you communicate directly with the constables, or does
4  this process occur through your employees?
5  A.  Generally through the employees.
6  Q.  So it's not -- let me rephrase.
7      So this is part of a system you've set up that you don't
8  have to be involved in handling these batches and sending them to
9  the constables?
10 A.  No.  I'm involved in everything at Mountain Land, to one
11 extent or another.  So it's not been set up so that I'm not
12 involved.
13 Q.  Oh, no, but it's set up so you don't have to micromanage
14 either, right, you can trust that your employees are doing what
15 you told them to do?
16 A.  Yes.  The reason I'm hesitating here is the question
17 makes it sound like there's communication and direction from
18 Mountain Land with the constables, there's not.
19     Our employees at Mountain Land, as updates are provided
20 to us, they put the updates in the notes, period.
21 Q.  You're saying there's no -- help me understand this.
22     You're saying -- okay, so Mountain Land delivers writs
23 of execution to the constables by email.
24 A.  No.  They come pick them up.
25 Q.  Oh, they come physically pick them up.  Okay.  I've got

Page 60

1  to remember that for the future questions.
2      And when the constables pick up the writs, that's the
3  only communications Mountain Land is having with constables?
4  A.  There are also periodic reports coming back from the
5  constables saying, "Here's your check, here's" -- yeah.
6  Q.  And those reports for when you get payments, do they
7  send those in batches?
8  A.  Yes.  The reason for the hesitation: we don't know how
9  they calculate what they send or when they determined to send
10 them, but we get them generally twice a month.
11 Q.  And they send the payments reports by email?
12 A.  Yes.
13 Q.  And how do you verify how much money the constable
14 collects and keeps for itself?
15 A.  We have no idea.
16 Q.  Now, in the discovery responses, you mentioned 400 --
17 sorry.
18     Out of the 1,316 writs you provided to the constables in
19 the time period we discussed before, you mentioned that out of
20 that, they provided you back 494 individual payments.
21     Does that sound right?
22 A.  Sounds about right.
23 Q.  And out of those 494 individual payments, the constables
24 provided you -- oh, sorry, you want to say something, go ahead.
25 A.  Remittances.

Page 61

1  Q.  I can't call it payments?
2  A.  You can, yeah.
3  Q.  Okay.  Because I'm already struggling here.
4  A.  Our system calls them remittances.
5  Q.  Okay.  So if I say payments, you'll know that I mean
6  remittances.
7  A.  Okay.
8  Q.  And I might not.  I guess in this context, I'm talking
9  about payments from the constables to you.
10 A.  Yes.
11 Q.  Okay.  We're not talking about what they collect.
12 A.  That's what I wanted to clarify.
13 Q.  Yes.  I want to be sure we're clear on that, too.
14     You guys keep changing my terminology, though.  At some
15 point it'll break.
16     Out of those 494 payments, the constables included zero
17 certificates of sale?
18 A.  That is correct.
19 Q.  And when the constables serve the writ of execution, do
20 they provide you with a proof of service?
21 A.  No.  What do you mean by proof of service?
22 Q.  Something you can file with the court.
23 A.  No.
24 Q.  So you don't know how many -- of the writs you deliver
25 to the constables, you don't know how many are being served?

Page 62

1  A.  That's correct, through that process.
2  Q.  Okay.
3  A.  Remember that I told you they provide us periodic
4  reports whenever they want to?
5  Q.  Okay.
6  Q.  Those reports will say "writ served".
7  Q.  Okay. And will the reports tell you how the writs were
8  served?
9  A.  No.
10 Q.  And the reports don't give you anything you can file
11 with the court to notify the court the writ was served?
12 A.  Correct.
13 Q.  And out of those 494 payments, do you know how many of
14 those came from the constables actually executing the writ,
15 seizing the debtors' property, and selling it?
16 A.  I don't.
17 Q.  Have the constables ever notified you that they sold a
18 debtor's property?
19 A.  Not that I'm aware of.
20 Q.  Do you ever collect debts from people who own mobile
21 homes?
22     Let me rephrase that. That's a stupid way to ask that.
23     Do you ever collect debts for the mobile home
24 communities?
25 A.  No.

Page 63

1  Q.  Okay. And when you provide the writ of execution to the
2  constables, what specific instructions do you give the constables?
3     I think we kind of went over that: it's none.
4  A.  None.
5  Q.  Did you, in the beginning, provide them any
6  instructions?
7  A.  No.
8  Q.  So all the way back to the 1990s, your process has been
9  to deliver a writ of execution to the constables and then walk
10 away and let them do their thing?
11 A.  Our understanding has been the same all along, which is
12 they do their job and we don't have a right in their space. So
13 that is correct.
14 Q.  Are you aware -- well, no, stop.
15     I want to circle back to what you said about
16 communications with the constables.
17     Is it your testimony that your employees don't
18 communicate with the constables in any other -- to discuss what's
19 going on with these writs?
20 A.  Yes, that is my testimony.
21 Q.  Are you aware of --
22 A.  They'll swing by and pick the checks up and I'm sure
23 they're saying, "How's your day?", you know.
24 Q.  Yeah. Do you know if any of your employees are familiar
25 or friendly -- it's a weird way to put it -- but on a good working

Page 64

1  relationship with the constables or the constables' employees?
2  A.  I don't know that. I would be shocked if there's not
3  some sort of association and friendship.
4  Q.  And why would that shock you?
5  A.  I think it's normal. I consider you a friend and I just
6  think it's the way human beings are wired.
7  Q.  In Discovery, I was given a phone call between the
8  constables and one of your employees.
9     Are you aware of that?
10 A.  Yes.
11 Q.  So I want to understand -- I don't really want to put
12 all that in the record, but I do want to discuss the phone call in
13 brief.
14 A.  You bet.
15 Q.  Who is the employee that made that phone call?
16 A.  Her name is Jenna.
17 Q.  And what's her last name?
18 A.  Adams; it may be Adam.
19 Q.  She's your employee?
20 A.  Yes.
21 Q.  What is her role there?
22 A.  She works in the operations department, in legal. She
23 manages several of the cronies, underlings. She's my assistant as
24 well.
25 Q.  In that phone call, she speaks with who?

Page 65

1  A.  Cory.
2  Q.  That's Cory Revel [phonetic], if you know?
3  A.  I believe that's his last name, I don't know.
4  Q.  Do you know if he's a constable or not?
5  A.  I don't believe he is, but I don't know that.
6  Q.  Do you want me to play that phone call?
7  A.  No, I'm familiar with it. I'm very familiar with it.
8  Q.  It sounds to me in that phone call, they're pretty
9  familiar with each other.
10    Am I wrong on that?
11 A.  No, I think they are. Cory's been coming to our office
12 for years.
13 Q.  Okay. He's the one who picks up these writs?
14 A.  Not always.
15 Q.  But enough that they're familiar with each other?
16 A.  Yes.
17 Q.  Now, here's the weird question.
18    The phone call gets cut off at the end, and they say
19 "We're going to call back and talk to each other.", but there's no
20 second call.
21 A.  We looked. They're randomly recorded.
22 Q.  Okay. Convenient, but okay. It's okay.
23 A.  Can I just give you more detail on that for my personal
24 satisfaction?
25 Q.  Yes.

Page 66

1  A.  That's the same day you and I spoke about the potential
2  lawsuit.  So I went over and said to Jenna, "I'd like that writ
3  recalled."
4       That conversation, I think by then Cory had known about
5  you.  I'm not really pleased with that conversation because I
6  don't like that dialogue happening about anybody, but it is what
7  it is.
8  Q.  I'm not at all bothered by it.  I was just wondering why
9  the second part of the phone call wasn't produced.
10 A.  Now you know.
11 Q.  That was my only issue, and why it occurred.  Because if
12 there's no communication, that sort of changes the narrative.
13 A.  Yeah, I actually don't believe there was a second phone
14 call.  I think there was no call back.
15 Q.  Yeah, either way is fine.  I am not at all bothered by
16 it.  That wasn't my concern, but I do appreciate the clarification
17 because that my concern was delivery of it.  And now we understand
18 why.
19      Just so we're on the same page, though, when the
20 constables come to pick up the writs, is Jenna the one that gives
21 them to him, or is it anybody?
22 A.  Anybody.
23 Q.  Since this case has been filed, is it fair to say that
24 it's come to your attention the constables are collecting for you
25 by sending collection letters?

Page 67

1       MR. GRASSI:  Object to form.
2  A.  Yes.
3  Q.  And that is contrary to your prior expectation, is it
4  not?
5       MR. GRASSI:  Object to form.
6  A.  Yes.
7  Q.  You weren't aware the constables were sending letters to
8  collect these debts?
9       MR. GRASSI:  Object to form.
10 A.  No.
11 Q.  Has the process changed as a result of that awareness?
12 A.  Yes.
13 Q.  Tell me how the process has changed.
14 A.  We stopped sending writs.
15 Q.  To all constables or just these constables?
16 A.  All constables.
17 Q.  Is that fair to say, then, that you disapprove of the
18 way they collected this on your behalf?
19 A.  It raised concerns.
20 Q.  And I know that we've gone over this, but I want to be
21 certain that it's crystal clear.
22      So you never told the constables, "Collect these debts
23 by sending letters."?
24      You never told them to do that?
25 A.  That is correct.

Page 68

1  Q.  And you don't know how much the constables kept from the
2  amounts collected on the debts on the judgments you delivered to
3  them?
4  A.  No.
5  Q.  Does that concern you?
6  A.  Yes.
7  Q.  Did it concern you that the constables were not
8  registered as debt collectors with the Utah State?
9       MR. GRASSI:  Object to form.
10 A.  No.
11 Q.  And the reason it didn't concern you is because you
12 didn't -- no, never mind.
13      Okay.  There was a collection call between your company
14 and my client on June 10th, 2022, is that correct?
15 A.  Yes.
16 Q.  Do you know the substance of that phone call?
17 A.  Yes.
18 Q.  Can you tell me what happened during that phone call?
19 A.  Based on the notes, there was a contact made,
20 Mini-Miranda was given, date of birth was verified, what we call
21 7 and 7 consent was obtained.
22      And your client said that he spoke to his insurance
23 company, that they should be able to process this claim.
24      Our representative said we're not going to be able to
25 hold this for insurance, he's welcome to set up a payment plan to

Page 69

1  secure these accounts, but at this point would not hold up on the
2  lawsuit; it wouldn't stop the lawsuit without payment, told your
3  client when the judgment was scheduled to be signed on the 22nd.
4       And he said he would call the courts and if his
5  insurance will not cover, he will call us back.
6       That's the substance of the conversation.
7  Q.  And you're reading that from Exhibit what number?
8  A.  MLC 0051, Exhibit 2.
9  Q.  Have you listened to the recording of that call?
10 A.  I have.
11 Q.  And are those notes accurate to the call?
12 A.  To the best of my recollection, yes.
13 Q.  During that call, your employee did not ask what
14 insurance my client had, did it?
15 A.  That is correct.
16 Q.  And my client told your employee that he was divorced
17 from the co-defendant?
18 A.  Yes.
19 Q.  And you stopped immediately collecting from his ex-wife?
20 A.  We had never pursued against his ex-wife, but yes -- yes
21 and no.
22 Q.  Yeah, the ex-wife was never really -- we got over that.
23 A.  We got that resolved, yes.
24 Q.  And you did a check before you filed this to see if they
25 were still married, correct?

Page 70
```
 1   A.   We did.
 2   Q.   That was in the notes.
 3   A.   It was.
 4   A.   And we also do a reverse check where we look for dates
 5  of divorce and didn't find anything.
 6   Q.   Yeah, that was in the notes, correct?
 7   A.   Yes.
 8   Q.   Do you know why that happened then, why it slipped
 9  through the cracks somehow?
10   A.   I don't.  I will say that when this case was served, we
11  looked at that and found no errors in the system, so it's one of
12  those head scratchers.
13   Q.   Yeah.  And you and I talked about that in detail and we
14  got rid of Corie altogether, correct?
15   A.   Yeah.
16   Q.   Okay.
17   A.   And on our judgment and writ, we say "As to Charles
18  only."
19   Q.   Yes, that is correct.
20        Okay, I've handed you Exhibit Number 10.
21        [Exhibit 10 Marked]
22        Do you recognize Exhibit 10?
23        Well, yeah, do you recognize it?
24   A.   I don't.
25   Q.   You didn't write this -- well, let me submit for the
```

Page 71
```
 1  record that it's a letter.
 2        Is that a fair characterization of what this is?
 3   A.   It looks like a pleading.
 4   Q.   What do you mean by that?
 5   A.   There's a plaintiff, a defendant, and a case number
 6  listed on it.
 7   Q.   And the constables are listed there: Michael Erickson,
 8  Utah County Constable, his name and address is listed where the
 9  attorney is normally listed, correct?
10   A.   Yes.
11   Q.   And his signature even shows up where the attorney's
12  signature shows up, generally?
13   A.   Yeah.
14   Q.   To you, this looks like a pleading?
15   A.   Yes.
16   Q.   And the original balance is listed here as $5,542.18,
17  correct?
18   A.   As listed on this document, yes.
19   Q.   Okay.  And you didn't write this document?
20   A.   No, I did not.
21   Q.   And the date of this document says on it 8/23/2022,
22  correct?
23   A.   Yes.  It says "8/20 -- looks like it says "23/2022."
24   Q.   Okay.  And I don't know how good your eyesight is, but
25  at the very bottom there's a teeny tiny stamp.  He might have
```

Page 72
```
 1  covered it, actually.
 2   A.   Nope, it's there.
 3   Q.   Do you see where it says 8/18/22?
 4   A.   Yes.
 5   Q.   Does that look like a date to you?
 6   A.   It does to me, yes.
 7   Q.   And that coincides with the date written, handwritten,
 8  of 8/23/22?
 9        Not exactly, but they're within the same week of each
10  other?
11   A.   Yeah.
12   Q.   And the case number 229102019 is the same case number as
13  in your lawsuit against my client?
14   A.   Oh, crap, Eric.  Yes.
15   Q.   And now, in this letter, the total due is listed as
16  $5,800.31, correct?
17   A.   Yes.
18   Q.   And that's because -- or according to the letter, it
19  says the original balance, and then it adds $50 for a service fee,
20  $105 for a mileage fee, $88.13 for a commission, and $15 for a
21  notices fee, correct?
22   A.   That's what it says.
23   Q.   And the math is not your math, someone else did this?
24   A.   Yes.
25   Q.   And then attached to this letter is your writ of
```

Page 73
```
 1  execution.
 2   A.   The writ of execution that Mountain Land requested of
 3  the court that they issued, yes.
 4   Q.   Okay.  And it indicates -- there's a stamp by the
 5  constable, and it says the date served was August 25th, 2022, I
 6  think.
 7   A.   Okay.  You're looking more or less the upper right-hand
 8  corner.  It looks like it says 8/22 or 8/28 to me.
 9   Q.   Or 25 maybe.
10   A.   Yeah.
11   Q.   Okay.  Do you know the signature of -- is that Andrew
12  Collet [phonetic]?
13   A.   I have no idea.
14   Q.   And do you know what that stamp indicates?
15   A.   I do not.
16   Q.   Okay.  Let's go back to the first page.  Well, let's
17  generally talk about this.
18        You didn't review or see this letter prior to it being
19  mailed?
20   A.   That is correct.  I don't even know if it was mailed.
21   Q.   Oh, okay.  Right.  It could have been delivered in hand,
22  you don't know.
23   A.   Correct.
24   Q.   When did you first become aware of this letter?
25   A.   Sitting here today.
```

Page 74

1  Q. You haven't seen this letter before today?
2  A. No.
3  Q. Do you know how these fees were calculated: the service,
4  mileage, commission, and notices fees?
5  A. I don't.
6  Q. So you can't testify that they're accurate?
7  A. I have -- no, I cannot.
8  Q. Do you know why this letter is formatted to look like a
9  court filing?
10 A. I do not know that.
11 Q. Is mailing a writ of execution proper service of process
12 of a writ of execution?
13    MR. GRASSI: Object to form.
14 A. I do not know that.
15 Q. Do you know the process for how a writ of execution is
16 executed?
17 A. I do not.
18 Q. This letter says, "Please call my office within 10 days
19 to make arrangements to pay the judgment to avoid the sale of your
20 non-exempt personal property.", correct?
21 A. That's what it says, yes.
22 Q. And that's not something you authorized the constables
23 to say on your behalf?
24 A. No.
25 Q. And you didn't know they were saying that until you saw

Page 75

1  this letter today?
2  A. That's correct.
3  Q. Do you see anywhere on this letter where there's a
4  notice that the constables are a debt collector attempting to
5  collect a debt?
6     MR. GRASSI: Object to form.
7  A. The Mini-Miranda?
8  Q. Yeah.
9  A. I do not see it.
10 Q. And there is no 30-day right to dispute the debt notice
11 either, is there?
12 A. No.
13 Q. Let's -- one more question about the previous Exhibit,
14 Exhibit 10.
15    If you had been aware that the constables were sending
16 that letter to the debtors in your cases, would you have stopped
17 them?
18    MR. GRASSI: Objection, calls for speculation.
19 A. I don't know the answer to that question. I'd like to
20 believe that I would, but it's a hypothetical that I -- I don't
21 know.
22 Q. Irrelevant, because you didn't know they were sending
23 it?
24 A. Yeah.
25 Q. Okay. Let's go to Exhibit 11, then.

Page 76

1     [Exhibit 11 Marked]
2     Have you seen this letter before?
3  A. I have not.
4  Q. Okay. This letter is styled the same way as a legal
5  pleading, correct?
6     MR. GRASSI: Object to characterization.
7  A. Ironically, this one looks more like a letter to me.
8  But it does have the elements of a pleading.
9  Q. It lists the plaintiff and defendant, the parties?
10 A. Yes.
11 Q. Case number?
12 A. Yes.
13 Q. And it says, in all caps, "PLEASE TAKE NOTE OF THE
14 ATTACHED SALE NOTICE", correct?
15 A. Yes.
16 Q. Is this the first time you're seeing this letter?
17 A. Yes.
18 Q. This letter doesn't contain a notice that the constable
19 is a debt collector collecting the debt?
20 A. It does not.
21 Q. It doesn't contain a notice that says, "You have the
22 right to dispute this debt."?
23 A. It does not.
24 Q. Let's turn the page.
25    Is this the first time you're seeing page two of this

Page 77

1  letter?
2  A. Yes.
3  Q. Page two of this letter says, "Notice of proposed sale".
4  And it has a date, September 30th, 2022, and a time, 12:40;
5  correct?
6  A. Yes.
7  Q. And it says, in all capital letters, "NOTICE IS HEREBY
8  GIVEN", and then it goes in tiny letters that, that they're
9  selling -- basically, it's summarized that they're selling my
10 client's property.
11    Is that fair?
12    MR. GRASSI: Objection, calls for conclusion.
13 A. It appears -- yeah, but yes. The reason for the pause
14 is I don't know where your client is listed on here.
15    Oh, I do see him.
16 Q. Yeah, the plaintiff is listed as Mountain Land,
17 defendant my client, case number.
18 A. Yes.
19 Q. And the place of the sale is listed at my client's home
20 address, correct?
21 A. Where are you seeing that, Eric?
22 Q. Right there.
23 A. It's listed as 18525 Jefferson Ave, Cedar Valley, which
24 I'm assuming is your client's home address.
25 Q. And this is the first time you're seeing this?

Page 102

1  Q.  You're not aware that he used to own it?
2  A.  No.
3  Q.  Have you tried to send writs of execution to any other
4  constables besides Sindt, Kolkman, and Erickson for the purpose of
5  collecting the judgments?
6  A.  We've not sent any writs to any constables office other
7  than those, period.
8  Q.  When you do writs of garnishment, do they go to these
9  same three constables?
10  A.  No.
11  Q.  Who do you send those to?
12  A.  We use a variety depending on where the employer is.
13  Q.  And you don't send those other variety of constables
14  writs of execution?
15  A.  No.
16  Q.  And what is the reason for focusing the writs of
17  execution on these three constables and only these three
18  constables?
19  A.  It doesn't have anything to do with the constables; it
20  has everything to do with the concentration of our clients and our
21  primary business, Utah County.
22  Q.  Okay.  I have no other questions.
23       MR. GRASSI:  A couple cleanup questions, but should not
24  take long.
25  BY MR. GRASSI:

Page 103

1  Q.  So we talked briefly about documents produced.
2       Other than documents that were specifically withheld,
3  has Mountain Land produced all relevant documents requested?
4  A.  Yes.
5  Q.  And are you Quinn Kofford, a licensed attorney?
6  A.  I am.
7  Q.  And so when you filed that action, you filed it as an
8  attorney on behalf of Mountain Land Collections LLC?
9  A.  I did, yeah.
10  Q.  And to your knowledge, can a limited liability company
11  file a lawsuit without an attorney?
12  A.  No.  To the best of my knowledge, they cannot.
13  Q.  And then I do want to talk briefly about the documents
14  that were sent this morning.
15       You mentioned a set for sale; was there a spreadsheet
16  indicating Mr. Young's property had been set for sale?
17  A.  Not that I recall, no.
18  Q.  But that is a general spreadsheet?
19  A.  Yes.
20  Q.  Okay.  I think that's all I have.
21       MR. STEPHENSON:  Mr. Hill?
22       MR. HILL:  I have no questions of this witness.
23       MR. STEPHENSON:  Okay.  I have no follow-up questions.
24       THE WITNESS:  This was easy.
25       THE STENOGRAPHER:  Can I get an interest in copy orders.

Page 104

1       Mr. Grassi?
2       MR. GRASSI:  Yes, electronic is fine.
3       THE STENOGRAPHER:  Great.
4       Mr. Hill, are you interested in copy?
5       MR. HILL:  Yes, electronic as well, thank you.
6       THE STENOGRAPHER:  Sounds good.
7       And sir, are you interested in a read and sign?
8       MR. GRASSI:  Yes, he is.
9       THE STENOGRAPHER:  Through you?
10       MR. GRASSI:  Yes.
11       THE STENOGRAPHER:  Okay, great.
12       THE WITNESS:  If there's anything worse than hearing
13  your own voice, it's reading your own voice.
14       THE STENOGRAPHER:  And an electronic copy for you?
15       MR. STEPHENSON:  Yes.
16       [Adjourned at 12:32 p.m.]

Page 105

1                   CERTIFICATE OF DEPONENT
2  PAGE      LINE      CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18       I, Quinn Kofford, deponent herein, do hereby certify and
19  declare under penalty of perjury the within and foregoing
20  transcription to be my deposition in said action; that I have
21  read, corrected, and do hereby affix my signature to said
22  deposition.
23                          _____
24                               Quinn Kofford, Deponent
25

```
                                                    Page 106
 1                  REPORTER'S CERTIFICATE
 2  STATE OF UTAH  )
 3  COUNTY OF UTAH )
 4          I, Spencer Von Jarrett, a Certified Shorthand Reporter,
 5  Registered Professional Reporter, hereby certify:
 6          THAT the foregoing proceedings were taken before me at
 7  the time and place set forth in the caption hereof; that the
 8  witness was placed under oath to tell the truth, the whole truth,
 9  and nothing but the truth; that the proceedings were taken down by
10  me in shorthand and thereafter my notes were transcribed through
11  computer-aided transcription; and the foregoing transcript
12  constitutes a full, true, and accurate record of such testimony
13  adduced and oral proceedings had, and of the whole thereof.
14          I have subscribed my name on this 23rd day of April,
15  2024.
16          _____
17          Spencer Von Jarrett
18          Registered Professional Reporter #993793
19
20
21
22
23
24
25
```