Eric Stephenson (9779)
STEPHENSON LAW FIRM
250 North Redcliffs Drive, 4B #254
Saint George, Utah 84790
Phone: (801) 386-5200
ericstephenson@utahjustice.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| CHARLES YOUNG, <br> Plaintiff, <br><br> vs. <br><br> ROB KOLKMAN *et al.*, <br> Defendants. | PLAINTIFF'S DEPOSITION DESIGNATION <br><br> Case Number: 2:23-cv-00420-TS <br> Judge: Ted Stewart |

Plaintiff submits the following deposition designations in accordance with this Court's Pretrial Order.

### HEIDI CORDERO DEPOSITION
#### JUNE 10, 2025

**Cordero Dep. 10:7–25**

Q: Are you currently employed?

A: No.

Q: When were you last employed?

A: 2017.

Q: Okay. And is there a reason you are not employed right now?

A: Yes.

Q: What is that?

A: I'm disabled.

Q: Tell me about that. What disabilities do you have that prevent you from having a job?

A: Well, there's a few.

Q: Okay.

A: Depression. Anxiety. Sleep apnea is part of it. Insomnia. Chronic fatigue.

Q:  Okay.

A:  Fibromyalgia. I have chronic pain in my arms and my hands, my elbows, my shoulders. That's all that I can think of right now.

**Cordero Dep. 14:4–8**

Q:  Are there any things that make any of these things that we have talked about so far worse?

A:  Absolutely.

Q:  Tell me what does that.

A:  Stress.

**Cordero Dep. 14:14**

A:  Stress is number one.

**Cordero Dep. 30:21–31:9**

A:  He said a sheriff, quote/unquote, showed up at his store. He had a badge-looking emblem on his shirt and a gun and he served him the papers. Asked for me. He told him I didn't live there.

Q:  Okay.

A:  And he gave him the papers. And then he called me.

Q:  When you say the papers—

A:  Some sort of paperwork saying that they were going to sell all of his things.

**Cordero Dep. 33:9-21**

Q:  Tell me in regards to this debt, what actions of the constables caused you stress?

…

A:  Well, when I got the phone call from my husband saying I needed to come right away, he was very, very upset. He said, "There was a sheriff here looking for you."

…

A:  So I rushed over. And he was quite upset, like I said. He said that they were going to sell all his "expletive" stuff. Sorry.

**Cordero Dep. 34:4–23**

A:  He said, "You better take care of this right now." And so that's when I made the phone call to Nicholas. And I explained to him that I wasn't working.

He told me an amount. I remember that it would be per month to take care of it. And I said, "I need to talk to the person who's going to pay it for me, which was my husband, and I will call you back."

And within two minutes, five minutes, he called me back and he said – he said, "I'm sorry, but I can't take any money from you. I can't take any payments from you," he said, "because the debt has been transferred to" – I guess the constable.

So I got off the phone. And my husband was very paranoid. Very, very, very angry. Because all his things are there on his property and he was terrified that they were going to come and take it.

And so he was very angry with me. It caused a lot of problems for me.

**Cordero Dep. 39:15–19**

Q: Had you – you had not been, to the best of your recollection, served with the initial pleadings that ultimately resulted in this judgment?

A: I have never been served with any paperwork at all.

**Cordero Dep. 41:21–42:7**

Q: Do you recall being served with any papers before the constables came out to your husbands–

A: I have never been –

Q: – home?

A: Sorry. I need to wait.

Q: That's fine.

A: I have never been served with any paperwork –

Q: Okay.

A: – in regards to this.

**Cordero Dep. 42:8–15**

Q: Okay. So you don't recall whether or not you knew there was a lawsuit that had ended in a judgment against you?

A: I don't recall that.

Q: Okay. So the constables showing up may have been the first time that you knew about the debt being reduced to a judgment?

A: Possibly.

**Cordero Dep. 45:18-46:9**

Q. I believe there's information that on August 3, 2023, you called the collection agency.

A. That was when I spoke to Nicholas at N.A.R. Correct?

Q. I – I'm – I believe so, but I'm not sure.

A. That – it's got to be, because that's the only time I spoke to anyone. And that's when he told me we can set up a payment plan of this much a month. I wrote it all down. I remember that. And I said, "I will need to speak to Patrick to see if he can pay it for me."

And then he called me back within five minutes and said, "This is Nicholas from N.A.R. We cannot take any payments from you."

Q. And he said that was because it had been referred to the constable's office?

A. Yes.

**Cordero Dep. 47:16–48:23**

Q: What part of the constable's actions were upsetting to you?

A: Well, I wasn't witness to them, but the letter that I saw – and I'm – again, I'm not sure if it was – which one.

Q: Right.

A: Something about the sale. So the problems that it created with my husband and I, him being very angry with me, it was very scary because I didn't know if they were going to come and get all of his vehicles. He has a very good job that he works pretty hard and I was afraid for him that they might come and take his things.

A: I was hysterically crying. He was angry, yelling at me, telling me to fix it. And when I got off the phone with Nicholas and he said, "We could do a payment plan," I kind of felt a little relief.

Q: Yeah.

A: But then when he called back and said, "No," I was even more afraid. Like that means to me that there's something very serious going on or something very, very wrong here if they won't take money.

Like I said, my husband was very, very hypervigilant about – after that. "There's people driving by, they are slowing down." "I don't know who this guy is in front of my house." He lives on a busy road. He got a camera system. He put up six-foot fences.

I wasn't sleeping. Our relationship had been strained before, but after that, it got worse. He treated me very badly after that. He blamed me for causing problems – quote/unquote, problems.

…

Calling me irresponsible.

Horrible time.

**Cordero Dep. 52:11–19**

Q.  Is what causes you – or what caused you stress in this situation the fact that a constable showed up saying they could seize property?

A:  Well, before the constable showed up to my husband's door and told him these things or showed him the letter, I didn't have stress like that. Does that make sense?

Q:  Yes, it does.

A:  So I would say yes.

**Cordero Dep. 53:23-24**

Q:  Did they seize any property at the time?

A:  No.

**Cordero Dep. 55:9-12**

Q:  Okay. Well, some–some letter they gave you notice that there would be a sale of property–

A:  Yes.

Q:  –is that what you recall seeing?

**Cordero Dep. 60:8–61:6**

Q.  Okay.  Within the last five years or so, what other medical care providers have you seen?

A.  How many years?

Q.  Five.

A.  Is that including emergency?

Q.  Yes.

A.  Five years.  It's going to be hard to remember.  The one I am currently seeing, Sandra Rust – and you said medical, correct?

Q.  Yes.

A.  Oh.  Uintah Basin Medical Center emergency room in Vernal.  Sorry.  That's all I can remember.

Q. Okay.  What was that for?

A.  What was what for?

Q.  The Uintah Basin ER.

A:  So I don't remember the date. But I remember after this incident, I got a migraine and it lasted about a week. I couldn't get it to go away. So I went there for treatment.

Q:  When you say after this incident, would you say – would you associate that ER visit –

A:  I did –

Q:  – with the stress of this –

A:  I did. Yes. I did associate it.

**Cordero Dep. 62:8-63-16**

Q:  Okay.  And you mentioned the migraine that you would associate with the constables showing up and saying they could seize property and the stressors that came from that with your husband and things. How has this stress – well, I should say, generally, how does stress in your life manifest itself?

…

A:  Normally, I get a stiff neck.  Stiff upper – my shoulders and my back, upper back.  Sometimes if it's really bad, I get a – my back will seize up, my lower back, and I can't stand up very straight.  Very strange physical manifestations.

Q:  Yeah.

A:  I can't sleep.  And I normally can't sleep very well, but during stress, not sleeping.  Last night, I slept three hours, for example.

Yeah.  Extreme pain and...  The migraines, I have not really dealt with. And that's why I kind of because I don't think I have – I had ever had a migraine before.  And so – yeah.

Q:  Did any of the medical care providers or counselors provide an opinion that what you have described has been caused by stress?

A:  They absolutely say that stress in my life and extreme stress causes these issues that I have.

**Cordero Dep. 71:3-72:20**

Q:  Okay.  Are there any other conditions that you would associate with the stress that came from the constables showing up?

A:  It just worsened everything for me. Just my ability to sleep, my worry, the stress with my husband, the arguing, the... He kind of started to be abusive mentally and verbally to me because of it.

Just I started to have a panic disorder again. Like waking up in the middle of the night, panic attacks, which I had 20, 30 years ago, but they went away.

Q:  Yeah.

A:  But during extreme stress they do come back.

Q:  Okay. How long would you say that these extra conditions lasted?

A:  Honestly, I think I'm still struggling.

…

Q:  These extra conditions you described feeling because of the constables coming out, has that subsided?

A:  I don't think so.

…

A:  I think their – I think that with what happened, it changed my husband's and my relationship forever.

And I know that some of the symptoms that I have are still due to – we're here today, you know. This has been a really big worry for me and caused stress knowing that I had to come and travel this far. And it's difficult, really difficult for me to travel this far, and financially I don't have, you know, a job. So to pay for a hotel, to pay for food, or find someone to bring me, find someone to drive me – help me drive. I can't drive at night.  It's just all big to me.

**Cordero Dep. 81:13-84:2**

…

Q:  How did these four pages–how did these three letters get into possession of your attorney?

A:  Well, I must have sent them.

Q:  Did you –did your husband send these letters to your attorney or did you?

A:  I'm sorry, it's been so long. Is it possible that I have seen both of these because they are so similar? Because they talk about a sale?

A:  And I–I must have seen both of them, if I sent them to you.

Q:  Do you remember whether you sent these letters to me?

A:  I must have if you have them.

…

Q: Do you recognize that date and time as when the sale was going to take place?

A: I know that they said they were going to sell his or our things. And I remember …

Q: Why did you call me?

A: Because they threatened to sell everything that we had and I tried to call to fix it and they wouldn't accept any money. And I just kind of got concerned who this company was, because it wasn't the original company.

And so I started to Google and figure out who this was, and so up until just not too long ago, I really, really thought that they were coming to sell all our things.

Q: "They" meaning the constables?

A: Yes.

**Cordero Dep. 84:3–9**

Q: And when the constable indicated to you that they were going to sell your property on August 4, 2023 at 11:50 a.m., did you believe that to be true?

A: Yes. Up until very recently I believed that, that – I thought that that's what they were going to do. I thought that they were planning on doing that until I called you.

**Cordero Dep. 84:10–25**

Q: And do you believe that if the constables lied to you about anything, they should be held accountable for that?

A: Absolutely.

Q: If the constables violated any laws, should they be held accountable for that?

A: Yes.

Q. If the constable said to you that they were going to take your property but they didn't intend to take your property, should they be held accountable for that?

A. Yes.

Q. Is it your fault that the constables sent you these letters but didn't actually sell your property?

A. No.

Q. Whose fault is it?

A. Well, I would like to know. It's obviously – if they lied, if they made this up to scare me, it worked, but –

Q. Being – okay. Being –

A. If they had no intention of doing this sale, it's very damaging to me.

Q. So being told that your property would be seized and sold, is that – did that cause you the emotional distress, anxiety, and fear that you talked about earlier?

A. Yes.

Q. And that – being told that your property would be seized and sold, is what caused – is that what caused your husband to be mad at you and have conflict with him?

A. Yes.

**Cordero Dep: 86:4-10**

Q. And if they lied to you about earning those costs, should they be held accountable for that?

A. For sure.

Q. And if they violated the law in adding those costs, should they be allowed – held accountable for that?

A. Absolutely.

**Cordero Dep. 86:11-16**

Q. And you said your husband was concerned with – or you – excuse me. Were you concerned that – help refresh my memory, because most of the things that the constables would have taken would have belonged to your husband and that caused part of the problem?

A. Yes.

**Cordero Dep. 87:7–18**

Q. And the – is it – and tell me – let me be sure I'm clear that you didn't call N.A.R. to make payments on this debt until after receiving one of these letters?

A. Correct.

Q. And even though you're not sure which letter it was, you know it was after you got a letter from – that your husband received from a constable?

A. Correct.

Q. And your – that constable's name is noted at the top, Constable Rob Kolkman, on all three letters?

A.  Yes.

Q:  And your – that constable's name is noted at the top, Constable Rob Kolkman, on all three letters?

A:  Yes.

**Cordero Dep. 87:21-88:8**

Q.  If you look at this – let's look at the first one again.  Is this letter – when it says the – on this letter, it says the judgment amount, the writ of execution amount, and the total balance due, and then it says, "Please contact this office within 10 days of the date of this letter."

And what do you think this letter indicates to you?  What is it trying to say to you?  What – how do you interpret this letter?

A.  Well, I would assume call the office and pay it.

Q.  Okay.  And pay the constable?

A.  Yes.

**Cordero Dep. 88:9-18**

Q.  Look at the second letter, which is these two pages.  Pages 2 and 3 of the exhibit.  This one says "When sending payment or calling in reference to this letter, please refer to DOCKET # 227214."

Do you – how do you interpret this letter – just this page of the letter?

A.  That this is who you pay.  This is– To stop the sale or to fix it, you call this number and give them this docket number and then you would make payments to them.

**Cordero Dep. 89:10–23**

Q.  If you look at page 2 of this letter, which is page 3 of the exhibit, does it mention that you can make payment by card, cash, or certified funds?

A.  It sure does.

Q.  And does it say – well, read what it says next.

A:  "Contact this office immediately to make a payment or arrangements to cancel the sale."

Q:  Okay. And how do you interpret that?

A:  If you want to keep your stuff, you better call and make payments.

Q.  Okay.  And is it possible this is the letter that triggered your phone call to N.A.R.?

A.  I bet.

**Cordero Dep. 89:24-91-3**

Q: Okay. Len's look at the last – the third letter, which is the fourth page of the exhibit.

This is a – its undated, correct?

…

Q. Do you believe this letter came after the notice of sale letter that we looked at a minute ago?

Well, then read it and then tell me.

A: "A sale of your personal property has been set and a Notice of Sale was mailed to you at the above stated address. In order to cancel this sale you must call my office and make a payment prior to the date of the sale. Extra costs incurred for setting and posting this sale will be added to your balance."

Q: So how do you interpret this letter?

A: Again, we're going to sell your stuff. We have already set a date. If you don't call me to pay this, extra costs will be added.

Q. And does this letter indicate – do you agree that this letter refers to the notice of sale we just looked at a minute ago?

A. It does.

Q. And so do you believe it came after the notice of sale?

A. Yes.

**Cordero Dep. 91:16–24**

Q. Have you any knowledge of whether or not a constable is allowed to collect payments from you rather than seize and sell your property?

A. I didn't before, but I do now.

Q: And now what is your belief on that?

A: I believe that it's illegal.

Q: Okay. And if it's illegal, that you believe the constable should be held accountable for it?

A: Absolutely.

**Cordero Dep. 92:12–93:8**

Q: And what is the reason you filed this lawsuit?

A: Well, first of all, I tried to – first of all, the notice that caused all the issues about selling our property or Patrick's property or my property, I'm trying to call the N.A.R. company to fix it; being told that they wouldn't take my money just compounded everything, made it very upsetting because I would think that if

they wanted to fix it, they would have took my money or made payment arrangements or something.

But they told me they couldn't do that, that I had to call this other company. And when I called – or excuse me, when I got off the phone, I just started to Google this company and that's when I read quite a few things that scared me, that upset me. And that's when I looked for an attorney.

Q: An attorney to do what? To do what?

A: I reached out to you to help me to fight this sale. This – I was still terrified, so was my husband, that they were coming to his property to take everything. I didn't know if they were still coming. I thought they were and so did he.

**Cordero Dep. 93:9-15**

Q. Okay. So I think you answered this already, but I want to be sure I understood. Once the constables mailed the letters to you or your husband, you didn't hear back from N.A.R. or Olson Shaner, right? They – nobody else tried to collect it, just the constables; is that right?

A. From my understanding, yes.

**Cordero Dep. 94:14–95:7**

Q. Okay. And you don't know one way or another whether or not the constable's actions were illegal in any way?

A. I do now.

…

A: I know that they were not – from what I understand, they had no intention of selling property. In this letter they say that they were coming on this date in August. They didn't come. And I don't know if that's because I hired an attorney.

From what I also understand, that – well, a lot of things. A lot of things that I think I have read now that I understand a little bit more. That they broke a lot of laws in relation to collecting debt. And the rules – I guess there's rules and regulations that they have to follow.

**Cordero Dep. 96:6-97:6**

Q. The document that the constables gave your husband, you testified before that you didn't know whether or not any of the documents that you've been presented were those documents. Is that still correct?

A. No.

Q. You can tell me for certainty which documents they gave you –

A. It was one of these sale documents at least.

Q. Okay.

A. I have never seen this one.  The number marked Exhibit 1, I've never seen that one.

Q. Exhibit 1.

A. But it was for sure one – you know, since these are together, I don't know.  It's one of these.

Q. Okay.  But you don't know which one?

A. It's been too long. Sorry.

Q. That's okay.

A. But I – I must have seen both of them.

Q. Could it have been any other document –

A. No.

Q. – that's not before you now?

A. No, because I do recognize – because I remember specifically looking for a date and there was no date on it. When I was talking to N.A.R., I made notes on the paper.  When I was talking to Nicholas.

**Cordero Dep. 100:18-21**

Q. You don't know whether or not the constable's office was making up the sale of the personal property?

A. Well, from what I read, that they set a date for sale and they didn't show up.

**Cordero Dep. 103:1-13**

Q. Your complaint mentions that the constables have violated your right to your – well, intruded upon your seclusion.  Can you tell me what you mean by that?

A. Well, it means basically that – I'm referring that they are – someone might show up at any time from this debt, I guess.

Q. You said you're afraid?  That's a current fear of yours?

A. That someone might show up –

Q. Yeah.

A. – and take my car or take my home.

Q. In regards to this claim, yes?

A. Yes.

**Cordero Dep. 104:7–12**

Q:  I'm going to follow up with one. On his last question, if the constables have received more than 10,000 writs of executions from law firms and never executed any of them, would that indicate to you that they didn't intend to execute yours?

A:  Absolutely.

ROB KOLKMAN FIRST DEPOSITION
APRIL 22, 2024

**Kolkman First Dep. 6:25**

Q:  And Constable Kolkman LLC, you own that 100 percent?

A:  Yes.

Q:  And how many employees does Constable Kolkman LLC have?

A:   Right now we're one, two — somewhere between four or five.

**Kolkman First Dep. 10:4–11:1**

Q:  And what does Constable Kolkman LLC do that's different from your other company?

…

A:  We mainly focus on writs of execution.

Q:  And the other company focuses on what?

…

A:  It serves all kinds of legal process including writs of execution.

Q:  And so Constable Kolkman LLC is specifically targeted, though, at writs of execution only?

A:  Constable Kolkman.

Q:  Constable Kolkman LLC?

A:  Yeah.

Q:  That's just writs of execution?

A:  Pretty much.

**Kolkman First Dep. 19:4-6**

Q:  Most of your efforts are spent for Kolkman—I'm sorry, for Constable Kolkman LLC?

A: Yes.

**Kolkman First Dep. 22:23–23:4**

Q: So you took over the writ of execution side of Michael Erickson's business, correct?

A: I believe so, yeah.

Q: And that means what? Explain exactly what you mean by taking over that writ of execution part.

A: We started handling the writ of executions.

**Kolkman First Dep. 26:2-4**

Q: When you took over Michael Erickson's business, you took over clients?

A: Yes.

**Kolkman First Dep. 28:8–10**

Q: And Kolkman Constable LLC, that's the new company: that executes writs of execution?

A: Correct.

**Kolkman First Dep. 28:14-23**

Q. Okay. So Mountain Land, Cherrington, Olson Shaner, and NAR: which company do they hire when they want writs of execution executed?

A. Do they hire?

Q. Yeah.

A. They are clients of ours.

Q. Okay. Which company, though?

A. Constable Kolkman.

Q. Constable Kolkman LLC, the new one?

A. Yeah.

**Kolkman First Dep. 34:2–8**

Q: Let's talk about Constable Kolkman LLC, the new company. You said its job is to serve writs of execution; is that right?

A: Yeah.

Q: Does that company serve any other documents?

A: Not to my knowledge.

**Kolkman First Dep. 34:20–35:4**

Q:  How many writs of execution does Constable Kolkman LLC serve in a given week?

A:  Kolkman Constable Services?

Q:  The new company, Constable Kolkman LLC.

A:  How many do we serve in a week?

Q:  Yeah.

A:  Oh, anywhere from 20-plus.

ROB KOLKMAN SECOND DEPOSITION
OCTOBER 30, 2024

**Kolkman Second Dep. 6:22–25**

Q: And Constable Kolkman LLC, you own that 100 percent?

A: Yes.

Q: And how many employees does Constable Kolkman LLC have?

A: Right now we're one, two — somewhere between four or five.

**Kolkman Second Dep. 7:9–8:13**

Q: So who is employed with Constable Kolkman LLC now today?

…

A: We have Corey, Andrea.

Q: Hold on. Will you do me a favor and do last names too so we're on the record with the full names.

A: Corey Revill, Andrea Dobson. That's all we have in the office.

Q: Okay. And then you have servers?

A: Yes.

Q: And who are they?

A: I have Joslyn Stevens, Jose – oh, God – I can't remember his last name.

Q: Okay. Is he a deputy constable?

A: No.

Q: Okay. So other than Joslyn and Jose, are there any other servers?

…

A: It's Joslyn.

Q: Joslyn. Sorry, I heard that wrong. Okay. And Jose?

A: Yeah.

Q: So four total?

A: Yeah.

— 16 —

**Kolkman Second Dep. 9:22-10:1**

Q:  And so we're clear, this case, what we're talking about, all the activity was not Kolkman Constable Services LLC, it was Constable Kolkman LLC; correct?

A:  In this case, yes.

**Kolkman Second Dep. 23:8–24**

Q: Well, I asked you earlier about executing writs of execution, and you walked me through that process. So I'm asking how many writs of execution you've executed?

A: I don't know. 500-plus.

Q: And so that we're clear, the 500-plus executions you've conducted are all under Constable Kolkman LLC?

A: Yes.

Q: And the services of legal process, the around 200, is that under Constable Kolkman LLC?

A: No.

Q: Okay. So Constable Kolkman LLC, how many services of regular process summons and complaints and subpoenas, that kind of thing, has it done this year?

A: None.

**Kolkman Second Dep. 24:9–16**

Q: And how many execution sales have you conducted this year of personal property that's not a mobile home?

A: None.

Q: And how many execution sales did you conduct last year, 2023, that were not mobile homes but were just regular property?

A: None.

**Kolkman Second Dep. 30:1–6**

Q: Constable Kolkman LLC, you started that in January of 2023?

A: Yeah.

Q: And you took it over from Erickson, Michael Erickson?

A: Yeah.

**Kolkman Second Dep. 31:11–14**

Q: What about the letters that you mail to people? Those look the same to me. Did he give you his letters?

A: Yeah.

**Kolkman Second Dep. 32:7–12**

Q: I'm trying to create a list, so I wanted to keep it generic. But did you take his phones? His computers? Anything?

A: Took the program.

Q: Okay. That's FileMaker Pro?

A: Yep.

**Kolkman Second Dep. 37:3-38:19**

Q: Okay. So you're familiar with the Utah Consumer Sales Practices Act requirements?

A: Not much.

Q: Then how can you be sure you're not violating it?

…

A: Our practice is to take care of both parties. The objective of the writ of execution is to satisfy a judgment. We work with both the plaintiff and the defendant, mostly the defendant, to help them satisfy that judgment in the least destructive means or the least – you know what I mean.

Q: I don't.

…

Q: Please explain. What do you mean "the least destructive means"?

A: We try to take care of the defendants as well as the plaintiff and work with the defendant to make it easy for them – easier for them to satisfy the judgment.

Q: And what do you mean by "least destructive means"? What's more destructive than what you already do?

A: I don't follow.

Q: Well, I'm just following your lead. You said "least destructive means." What does that mean?

A: By seizing and selling their property that they're going to have to be – that will be sold at pennies on the dollar, they will lose that. They would have to replace that, and the money that we would get from a sale would be not enough to cover the cost of having the sale.

— 18 —

So the defendant would be more upside down and the plaintiff would not be ahead, and the judgment would still be there even larger.

Q: So if the cost of the sale outweigh the value of the sale, you believe it's better to not hold the sale?

A: Common sense would say that, yeah.

**Kolkman Second Dep. 44:14–25**

Q: So you're interpreting this writ to give you authorization to collect payments instead of seizing the property?

A: According to Rule 64(e).

Q: And what does Rule 64(e) say?

A: Not a verbatim quote, but pretty close to – to seize and sell all non-exempt personal property or payment.

Q: Okay. So other than this writ and Rule 64(e), do you have any other authority to collect payments?

A: No.

**Kolkman Second Dep. 46:19–48:1**

Q: Do you speak with debtors over the phone?

A: I speak with people who have judgments.

Q: And you speak with them about the judgment?

A: Yes.

Q: And about paying the judgment?

A: Yes.

Q: And about making partial payments on the judgment?

A: We do not bring that up.

Q: You never bring up making partial payments?

A: No, we don't bring that up.

Q: When the debtor brings it up, then what happens? You do discuss making partial payments with the debtor?

A: Yes.

Q: And you allow them to make partial payments?

A: On the judgment, yes.

Q: And you discuss the various other issues like fees with them when you're making those arrangements?

A: Yes.

Q: And you decide the amount of a payment that you're willing to accept from the debtor?

A: We work with the debtor.

Q: You want to make sure if they commit to making a payment arrangement, they can keep it?

…

A: Yeah.

**Kolkman Second Dep. 50:8–13**

Q: Okay. And Constable Kolkman LLC does all of those things that we just discussed. Constable Kolkman LLC mails letters, makes phone calls, collects money from debtors, and discusses payment arrangements with debtors; correct?

A: Yeah.

**Kolkman Second Dep. 51:9–18**

Q: And does your office – how does that – how are these writs of execution delivered to your office?

A: We pick them up.

Q: And how often do you pick them up?

A: Maybe once a week.

Q: And how many do you pick up each week?

A: Varies.

Q: And what does it vary between?

A: None and 50.

**Kolkman Second Dep. 56:17–57:14**

Q: How many writs of execution has Olson and Shaner given you in the last two years?

A: Many.

Q: More than a thousand?

A: Probably.

Q: How many writs of execution did the Cherrington firm give you in the last two years?

A: I don't know.

Q: In one of the other cases they said it was around 600. Does that sound about right?

A: Probably.

Q: Okay. Mountain Land Collections, in the last two years, they said they gave you more than 1,300. Does that sound right?

A: Probably.

— 20 —

Q: Okay. And Olson and Shaner is your biggest client; correct?

A: Probably.

…

Q: When I say Olson and Shaner's probably your biggest client as far as volume of writs they send to you. When you say "probably," how sure are you?

A: They are.

**Kolkman Second Dep. 59:21–60:8**

Q: And out of those thousands of writs of execution Olson and Shaner sent you, how many of those cases did you seize a debtor's property?

A: Probably none.

Q: And how many public sales have you had for those thousands of writs?

A: Well, since I didn't seize anything, I probably didn't sell anything, did I.

Q: Okay. And so your answer is none?

A: No.

Q: And how many of those did you collect payments on?

A: Probably 70, 80 percent of those.

**Kolkman Second Dep. 59:21-60:8**

Q: In those cases did you seize a debtor's property?

A: Probably none.

Q: And how many public sales have you had for those thousands of writs?

A: Well, since I didn't seize anything, I probably didn't sell anything, did I.

Q: Okay. And so your answer is none?

A: No.

Q: And how many of those did you collect payments on?

A: Probably 70, 80 percent of those.

**Kolkman Second Dep. 61:3-20**

Q: So if you get – so out of the thousands of writs of execution you get, 60 percent of those are served. And out of that 60 percent that are served, how many also get a notice of sale?

A: Probably 60 percent. That – all of them.

Q: Okay. 100 percent of the ones that are served?

A: That would be reasonable.

Q: Well, I want to make sure I'm getting the right answer. I think that was nonresponsive, but I'm not arguing with you, I just want to be sure that we're clear.

It's your testimony that 100 percent of the people who are served also get a notice of sale?

A: To be safe, 90 percent.

Q: Okay. At least 90 percent?

A: Yes.

**Kolkman Second Dep. 62:21–64:7**

Q: Your name is typed at the bottom. That counts as your signature?

A: Yes.

Q: Who wrote this letter?

A: Our office.

Q: And this is from a template that you use in other cases, too?

A: Yes.

Q: And this is – you just plug in the judgment amount, the cost of execution, and the balance amount, and the debtor's name and address?

A: Yes.

Q: And you knew what this letter said before you mailed it?

A: Yes.

Q: So why did you mail this letter to Elizabeth Hernandez?

A: To let them know what the costs were, if they wanted to pay it off, is what it says.

Q: So you were trying to tell them – tell my client you owe a judgment amount, and here's the amount. If you want to pay it off, contact us?

A: Yeah.

Q: Okay. So other than that, were you trying to convey any other message to my client?

A: No.

Q: And is it fair to say that this letter has been mailed to other debtors several thousand times, at least?

A: Yes.

Q: What criteria do you consider before sending this letter?

A: That they were served the writ.

Q: And this letter automatically goes out after they're served?

A: Yes.

**Kolkman Second Dep. 65:4–14**

Q: In the last paragraph you're telling the debtor to call you between 8:00 and 5:30; correct?

A: Okay.

Q: And you're telling the debtor to make the appropriate arrangements; correct?

A: Yes.

Q: And you're telling the debtor that failure to do so could result in additional court costs added to your judgment?

A: Yes.

**Kolkman Second Dep. 65:23–66:5**

Q: What does "appropriate arrangements" mean?

A: It means appropriate arrangements. "Payment must be made by credit card, cash, or certified funds. Please call our office."

Q: Okay. And you're saying that's not a call to pay?

A: It's a call to pay the judgment.

**Kolkman Second Dep. 70:12–15**

Q: The message is, call us, here's how much you owe, we can take payment for you; is that right?

A: Yeah, we can take a payment, yeah.

**Kolkman Second Dep. 71:15-18**

Q: But because you never seize the property it's – in this – for these purposes, it's always – that period is always triggered when you serve?

A: Yeah.

**Kolkman Second Dep. 74:10–75:3**

Q: Okay. And what do you call this letter?

A: I don't know what they call it.

Q: Okay. But you know they sent it?

A: Yes, it is attached to the front.

Q: And it's normally – you send this to all of your debtors that you're trying to collect from?

A: Yeah. During this time, yeah.

Q: And then did you write this letter or is this another template from Michael Erickson?

A: It probably – it's another template.

Q: And why has it got a court caption at the top?

A: Don't know. Because it's easier to figure out what it is because it's got the case number, it's got the plaintiff and defendant. I think that was the theory behind it.

Q: This isn't a court filing?

A: No.

**Kolkman Second Dep. 76:23–77:1**

Q: So as of … August 21, 2023, you did not have … $97.23 in commission earned?

A: No.

**Kolkman Second Dep. 77:20–22**

Q: Okay. But it's not earned yet as of the date of this letter?

A: No.

**Kolkman Second Dep. 78:6-79:3**

Q: You only charged 26?

A: At this time, yeah.

Q: But you hadn't earned or incurred that yet?

A: No. Which can be deducted if judgment is – or if they decide to pay the judgment in full.

Q: But Exhibit 2 and Exhibit 3 are two letters that say the balance due is $6,408.04; correct?

A: Correct.

Q: And do either of these letters say that we can adjust that amount?

A: They do not.

Q: Do either of these letters say we haven't actually earned all of that amount yet?

A: Guess not.

Q: Both of these letters say to the debtor who's seeing it, this is the balance due and it includes $259.23 that we've already added to the debt?

A: Right.

Q: And you send this same letter with the same kinds of costs to thousands of other debtors?

A: Yeah.

**Kolkman Second Dep. 80:1–81:21**

Q: This Exhibit 5, you mailed this to my client before you seized any of her property?

A: Yeah.

Q: And you mailed this as part of what you do in your normal practice?

A: Yes.

Q: And so this notice of sale is a template also?

A: Yes.

Q: And Erickson created this template and gave it over to you?

A: Yeah.

Q: And you've used this notice of sale template in thousands of other cases?

A: Yes.

Q: Okay. So what message were you trying to convey – and look at both pages – what message were you trying to convey with this letter and notice?

A: I think it's kind of self-explanatory.

Q: Okay. You want me to be the one to explain it or do you want to give me your – what's your knowledge? What's your reason?

A: We're going to schedule a sale on this date and at this time.

Q: Okay. You're telling her – my client that we have scheduled a sale?

A: Yes.

Q: Yes?

A: Yes.

Q: And the sale is going to take place October 6, 2023, at 1550?

A: Correct.

Q: And that's what, 3:30 – or 3:50 p.m.?

A: Yeah.

Q: And you list the property that you're going to sell at the sale?

A: Yeah.

Q: And you tell the – and it says that payment may be made by card, cash or certified funds?

A: Yeah, yeah.

Q: Okay. And then it says in bold letters – bold, large letters "Contact this office immediately to make a payment or arrangements to cancel the sale"?

A: Yes.

— 25 —

**Kolkman Second Dep. 85:5–11**

Q: But other than telling my client we have a sale scheduled for this day and time, is there any other message you're trying to convey? I guess you are conveying that they can make a payment to cancel the sale. That's pretty obvious; right?

A: Yeah.

**Kolkman Second Dep. 85:22–86:7**

Q: I think you've testified to this – that you never hold the sales, but you do send these notices of sale; is that fair to say?

A: Yeah.

Q: And so when you say that my client "Contact this office immediately to make a payment or arrangements to cancel the sale," that isn't true because it's not necessary for her to make arrangements to cancel the sale, or contact you. The sale is not going to take place?

A: Yeah.

**Kolkman Second Dep. 87:14-22**

Q: But this letter always goes out with the notice of sale. Always – all – they all go out, they always mail them before you find out what property you can actually take?

A: Yeah.

Q: And so when I look at this, it says "Payment may be made by card, cash, or certified funds," it says that; right?

A: Yes.

Q: And that is a true statement?

A: Yes.

**Kolkman Second Dep. 88:22–24**

Q: Even though you haven't carried out any sales in the last two years?

A: We have not.

**Kolkman Second Dep. 89:9–13**

Q: So the reason you send this letter is not to notify them a sale will take place, it's to trigger a phone call from them so you can discuss their assets?

A: Yeah.

**Kolkman Second Dep. 90:2-14**

Q: And why do you – why do you spend any time discussing over the phone with these people, with the debtors, what property they can take if you never take property?

A: So they are informed when they make their decision on what they want to do.

Q: So they know you can take that property?

A: Yes, and we can.

Q: Okay. So the message you're trying to convey is we have scheduled a sale, and we're going to hold that sale if you don't give us a call and make payment arrangements; is that fair?

A: That's fair.

**Kolkman Second Dep. 92:3–8**

Q: You've sent thousands of these letters in the last two years?

A: Yeah.

Q: And you've never actually seized or sold a property?

A: Correct.

**Kolkman Second Dep. 93:1–8**

Q: Okay. And when you send these notices of sale, your intention is to notify debtors that you've got a sale scheduled and they have to call you to cancel it?

A: What the letter says.

Q: And that's your intention when you send it is to trigger a phone call?

A: That's what we're looking for, yeah.

**Kolkman Second Dep. 97:13–98:9**

Q: Okay. What is the typical response you receive when you send this notice of sale or a notice of sale like this to someone?

A: We probably have a good 80 percent response.

Q: And out of those 80 percent, how many pay?

A: Probably 95 percent.

Q: And why do they pay instead of not?

A: Because they want to keep their stuff.

Q: Nobody really wants a process – someone coming to their house, taking everything they own and selling it?

A: No.

Q: In fact, that could devastate some families?

A: That's more devastating than what we're doing.

Q: Right. I think you mentioned that word earlier. That is devastating to people, especially those who may be hurt, sick, and don't have any –

A: Correct.

**Kolkman Second Dep. 98:10–99:24**

Q: Okay. So is it fair to say, then, that debtors, they have an emotional reaction when they call you after receiving the notice of sale?

A: I can't say what they're feeling.

Q: Do they sound like they're having an emotional response?

A: Nobody's really happy to talk to us.

Q: Do they ever express fear, concern, or urgency that – about this notice of sale?

A: Yes.

Q: Is that a typical response?

A: I couldn't say. I would suspect.

Q: Is that the response you're trying to convey when you send this letter? You want them to be afraid, have some concern, some urgency so they'll pay?

A: No.

Q: You're not – you're not concerned about their emotional response?

A: I didn't say that.

Q: Okay. Help me – just follow through with me.

A: I – we understand their position and we take time to explain what's going on.

Q: And in explaining what's going on, you tell them a sale is going on?

A: We tell them that there are sales scheduled, and we tell them what it's all about.

Q: And you tell them what property you're going to take?

A: We go over – you know, we need to go over what property you have, you know, or you can make a payment and be done with it.

Q: So when you send the notice of sale, you're aware that the response you're going to get from a lot of people is fear, urgency, concern?

A: Yeah.

**Kolkman Second Dep. 100:13–21**

Q: Okay. But the reason they called is because they believe you are carrying out this sale?

A: Because they realize that it is an actual court order.

Q: Okay. So you are aware that when you send the notice of sale, the response – the debtor will believe it to be true?

A: Yeah.

**Kolkman Second Dep. 105:17–20**

Q: Okay. So every time you go to someone's house in response – on the notice of the sale, time and date, every single time you cancel the sale?

A: Yes.

**Kolkman Second Dep. 108:21–109:2**

Q: Do you agree that if I handed you a stack of exhibits of notices of sale, that you would be able to say to me, I conducted none of those sales?

A: Yeah.

Q: None of these actually occurred?

A: That would be true.

**Kolkman Second Dep. 114:17–24**

Q: How many are you mailing a week? Notices of sale specifically?

A: Notices of sales?

Q: Yeah.

A: I couldn't give you an accurate answer on that, because I don't send them.

Q: It's thousands per year, though?

A: Okay.

**Kolkman Second Dep. 116:20–117:11**

Q: And so we're clear on scheduling, the word scheduling a notice of sale, that, to you, is simply sending a notice of sale?

A: Yes.

Q: Nothing more goes into scheduling a sale; right? You schedule the sale, that's it. You don't post it first. You don't advertise it first. You don't arrange for moving trucks or movers or storage. None of that occurs when you mail this notice of sale, until after, later?

A: Yes.

Q: And actually none of that occurs ever because you never actually sell the property?

A: Yeah.

**Kolkman Second Dep. 117:16-19**

Q: Did you contact law enforcement – any law enforcement agencies before serving Hernandez with a writ of execution?

A: No.

**Kolkman Second Dep. 118:15-17**

Q: But the rules require you to contact them, or is it the statute; right?

A Yeah.

**Kolkman Second Dep. 119:9–120:6**

Q: The statute, I'm going to quote it.

A: Okay.

Q: Quote – this is Utah Code Section 17-25a, 3-2a. Okay. "Constables serving process outside the county in which they are appointed shall contact the sheriff's office or police department of the jurisdiction prior to serving executions or seizing property." So it's your testimony that you know that law, but don't follow it when serving a writ of execution, or didn't at the time?

A: No.

Q: No, you didn't follow that law?

A: We did not contact, no.

Q: Okay. And you didn't normally contact – in most of your writs of execution before now, earlier, you – it was not your normal practice to contact local law enforcement?

A: No.

**Kolkman Second Dep. 120:25–121:12**

Q: You stopped – you were contacting law enforcement out of the county.

A: That was years ago.

Q: And you stopped because it was annoying; correct?

A: It was not annoying to me, but it was to –

Q: To them.

A: – dispatch.

Q: And is there any other reason you stopped?

A: No.

**Kolkman Second Dep. 122:22–24**

Q: So you don't ever contact law enforcement in Salt Lake, Utah, Davis,
or Weber County?

A: Unless there's a propensity of a disturbance.

**Kolkman Second Dep. 123:10–15**

Q: So even though the statute says when you're outside the county you're
appointed in, you still don't notify law enforcement before serving writs of
execution in Salt Lake County, Utah County, Davis County, or other areas in that
Wasatch Front?

A: That's true, we haven't been.

**Kolkman Second Dep. 123:21–124:3**

Q: It doesn't follow the statute, though. You agree with that?

A: It doesn't follow that rule maybe. But they don't want to be annoyed
with those calls, so we haven't.

Q: Okay.

A: I didn't do that by the letter of the law, correct.

**Kolkman Second Dep. 124:14–19**

Q: But most of your cases are along the Wasatch Front where you don't
notify law enforcement?

A: Yes.

Q: Okay. So you would be out of compliance with the statute on most of
them?

A: Yeah.

**Kolkman Second Dep. 127:1–9**

Q: So you have not advertised any sales in the last – from January 1st of
this year to now for property sales of regular property?

A: Correct.

Q: Okay. And that's because you didn't hold any sales of public property.
If you would have held the sale, you would have advertised it and it would have
shown up here?

A: Correct.

**Kolkman Second Dep. 127:17–24**

Q: I searched Utahlegals.com and I found no property sales advertised.

A: Okay, yep.

Q: And that's because there aren't any?

A: Correct.

Q: And you've already put it away because you know that's not in here?

A: Correct.

**Kolkman Second Dep. 128:7-12**

Q: How long have you been aware of the requirement to advertise a sale prior to a sale?

A: Long time.

Q: Since the '80s?

A: Yeah.

**Kolkman Second Dep. 129:18-22**

Kolkman Second Dep. 129:18–22

Q: Okay. And then Corey Revill, he's not a constable?

A: No.

Q: He came on board from Erickson to you?

A: Yes.

**Kolkman Second Dep. 130:8–131:12**

Q: Okay. He's one of the people that handles calls from debtors?

A: Correct.

Q: And he makes calls to debtors?

A: Correct.

Q: And they're not collection calls because you're not collecting money in those calls?

A: They're collecting on a judgment.

Q: Okay. So if I call them a collection call, that's accurate? You are collecting money in those calls?

A: In that terminology, yes.

Q: Okay. Corey Revill, he is in charge of mailing notices of sale?

A: Yes.

Q: And he, in those calls, he's part of – he explains to people we're going to sell your property if you don't pay?

A: Kind of a general...

Q: But he – but he does; right? He does that? He tells people we're going to take your property if you don't pay?

A: That's part of what he goes through, yeah.

Q: And he also gathers up information about what assets you could take if you were going to?

A: He makes an attempt to, yes.

Q: And he's the one that, over the phone, negotiates the payment arrangements?

A: He has in the past, yes.

**Kolkman Second Dep. 131:21–23**

Q: John Sindt, we've kind of touched on that before. You know who John Sindt is?

A: Yes.

**Kolkman Second Dep. 132:18–20**

Q: What's John Sindt's involvement with Kolkman Constable Services?

A: I just answered that. Advise.

**Kolkman Second Dep. 133:8–16**

Q: Okay. Does he own any part of any of these companies?

A: No.

Q: Does he act as management for any of the companies?

A: Act as what?

Q: Management. Does he manage any of your duties or obligations?

A: No.

**Kolkman Second Dep. 133:17–135:3**

Q: Does he have any financial stake whatsoever in any of these companies?

A: Yeah.

Q: Okay. What is that financial stake?

A: If we end up with a profit, he gets a little.

Q: How much does he get percentage-wise?

A: Probably 50 percent of the profit after all the costs are taken out.

Q: But he doesn't own any of the company?

A: He does not.

Q: So what's – what's the legal terminology you would use to connect – what's – how do you distribute 50 percent of the profit to him? Do you – as an employee or as a board member?

A: I – I don't know what you'd classify him as.

Q: Okay. What would you classify him as? I – I need help with it, because I need to know why he's getting 50 percent if he's not part of the company.

A: Because in the beginning he – I guess in a way he did broker the deal a little bit, because Mike wanted out and he knew of me and because we – you know, I worked for him many years ago, and so he kind of brought me in and, you know, said that, you know, we – you can take this over and we continue going on and stuff and I'll help you figure out what needs to be done.

Q: He's –

A: For a cut of the profit.

Q: Is he a lawyer?

A: Huh?

Q: Is he a lawyer?

A: No. Is he a what?

Q: A lawyer.

A: No.


**Kolkman Second Dep. 140:8-17**

Q: And for – when you worked for Wasatch Constables executing writs of execution, did you ever send a notice of sale?

A: God, that was five, six years ago, at least. Yeah, we did send – sales.

Q: And did you actually show up for those sales?

A: Yes.

Q: Every time?

A: Yes.


**Kolkman Second Dep. 141:13-21**

Q: When you worked for Wasatch Constables, did you ever – or anyone there – ever send a collection letter saying if you pay us, we don't have to take your stuff?

A: No.

Q: Did they – did anyone at Wasatch Constables ever set up a phone system to receive incoming calls so they can take payments from debtors?

A: Not that I'm aware of.

ROB KOLKMAN THIRD DEPOSITION
FEBRUARY 10, 2025

**Kolkman Third Dep. 4:12–5:2**

Q: You own Constable Kolkman, LLC?

A: Correct.

Q: And the one we're discussing in this case is Constable Kolkman, LLC?

A: Correct.

Q: And you own 100 percent of that company?

A: Correct.

Q: And John Sindt receives 50 percent the profits from that company?

A: Not that I'm aware of.

Q: Okay. How much does John Sindt receive from Constable Kolkman, LLC?

A: Let me correct. If we make a profit, I do share with him.

Q: What percentage?

A: The 50.

**Kolkman Third Dep. 30:5-16**

Q: If you did something that this writ or the law doesn't allow you to do, do you agree that would be violating your authority?

A: Yeah.

Q: Do you agree that if you did something you're not allowed to do or that's not legal to do, you'd be violating the scope of authority that Olson Shaner bestowed upon you?

…

A: If I did something illegal, yeah.

**Kolkman Third Dep. 36:7–38:2**

Q: The – my client is suing your company, Constable Kolkman, LLC, correct?

A: Yes.

Q: And that's the company that did all the work in this case with regard to my client, correct?

A: Correct.

Q: The other company that we talked about earlier didn't do anything that we have to talk about?

— 35 —

A: They didn't do anything, no.

Q: So Constable Kolkman, LLC mailed letters to my client?

A: Yes.

Q: It talked to my client by telephone?

A: No.

Q: No, it didn't?

A: No.

Q: Did it try to?

A: I don't know.

Q: Okay. So Constable Kolkman, LLC, does it mail letters to other debtors?

A: Yeah.

Q: Does Constable Kolkman, LLC talk to debtors by telephone?

A: Yes.

Q: Does Constable Kolkman, LLC discuss payment arrangements with debtors?

A: Yeah.

Q: Does Constable Kolkman, LLC discuss the consequences of non-payment with debtors?

A: Yes.

Q: Does Constable Kolkman, LLC arrange for payments with debtors?

A: Yes.

Q: Does Constable Kolkman, LLC accept and process payments from debtors?

A: Yes.

Q: Does Constable Kolkman, LLC receive a commission based on the percentage of the amounts you collect?

A: If we collect it.

Q: Well, yes, your commission is based on a percentage of what you collect?

A: Correct.

**Kolkman Third Dep. 41:4-11**

Q: When did you start obtaining writs of execution to collect partial payments?

A: In '23.

Q: That's 2023?

A: 2023.

Q: That was when you took over the business from Michael Erickson?

A: That is correct.

**Kolkman Third Dep. 43:7–19**

Q: Are constables allowed to lie to debtors?

A: No.

Q: Are constables allowed to threaten debtors with illegal or unintended consequences?

A: No.

Q: Are constables allowed to make false representations to collect your payments?

A: No.

Q: Are constables allowed to collect amounts the debtor never agreed to pay or are not legally required to pay?

A: No.

**Kolkman Third Dep. 43:7-19**

Q: Okay. Are constables allowed to lie to debtors?

A: No.

Q: Are constables allowed to threaten debtors with illegal or unintended consequences?

A: No.

Q: Are constables allowed to make false representations to collect your payments?

A: No.

Q: Are constables allowed to collect amounts the debtor never agreed to pay or are not legally required to pay?

A: No.

**Kolkman Third Dep. 43:24-44:7**

Q: Being a constable doesn't give you special authority to lie or deceive people in your job?

A: No.

Q: Debtors, whether they owe the money or not, they're entitled to the truth when you're communicating with them?

A: Uh-huh (affirmative).

Q: Yes?

A: Yes. Sorry. Taking a sip of coffee.

**Kolkman Third Dep. 46:7–11**

Q: When you're dealing with debtors, it would violate your oath of office if you ever lied to them or threatened them with consequences that you don't intend to follow through?

A: Yeah.

**Kolkman Third Dep. 52:20-22**

Q: What's the purpose of this document?

A: To let the people know there is a sale scheduled.

**Kolkman Third Dep. 53:14–17**

Q: So this document is intended to tell my client that we're seizing, selling your property on August 4, 2023, at 11:50 a.m.?

A: Yep.

**Kolkman Third Dep. 62:13–25**

Q: And that's the message you intended to portray to my client is that a sale of her property was set?

A: Yes.

Q: And it's your testimony that that statement in this letter is true?

A: Yes.

Q: You ask for payment in this letter, don't you?

A: "In order to cancel the sale, you must call our office to make a payment prior to the date of sale." That's what it does say.

**Kolkman Third Dep. 66:7–15**

Q: When did you earn the commission of $18.39?

A: These – these costs that are on here are as if everything gets paid and done.

Q: So are you saying you never earned the $18.39 because you didn't collect any money in this case.

A: No, we never did.

Q: So you didn't earn $18.39?

A: No.

**Kolkman Third Dep. 67:4-23**

Q: But you – when this letter went out, those fees were already added, but you had not earned those fees yet?

A: No.

Q: Okay. So at the time of the letter, Exhibit 9, March – excuse me – May 10, 2023, you had not earned the $50 or the $45?

A: We hadn't earned any of those, no.

Q: Including the 60 and the 45 I was going to get to next?

A: Yes.

Q: All of the fees you added were not earned as of the date of this letter?

A: Correct.

Q: Do you agree that this letter is an attempt to collect those amounts?

A: Let her know that it's out there, yeah.

Q: Well, it tells her the balance due includes those amounts, correct?

A: Correct.

**Kolkman Third Dep. 69:3–69:10**

Q: Does this letter tell my client that the additional costs are going to be added later? Does it say that in the letter?

A: No, it does not.

Q: Does it indicate in the letter that those costs have already been added?

A: It would – that's what the costs could be, yeah. Yeah.

**Kolkman Third Dep. 71:4–10**

Q: And all of your letters – none of your letters, I should say, include any warning that you're a debt collector?

A: No, they do not.

Q: And none of your letters warn my client that she has 30 days to dispute the debt?

A: No, we do not.

**Kolkman Third Dep. 76:17–19**

Q: I'm asking you do you want the people to believe the letters are true?

A: Yeah.

**Kolkman Third Dep. 79:11–80:6**

Q: Okay. And these notices of sale, like the one I've shown in this case, you've mailed thousands of those?

A: Probably.

Q: And the letters that we've all talked about, exhibits – I didn't mark this one. These exhibits – these other letters you sent that I've shown in this case, you have mailed thousands of those letters?

A: Probably.

Q: And you put the date on – and time for the Notice of Sale on this letter intentionally?

A: Yeah.

Q: And you put these costs in Exhibit 9 intentionally?

A: Do what now?

Q: You put these costs in here intentionally?

A: Yeah.

Q: And the way you style these letters is all intentional?

A: Yeah.

**Kolkman Third Dep. 81:2–14**

Q: Okay. But it's thousands of people who have called you after receiving your notices of sale and your other letters?

A: Yeah.

Q: And thousands of debtors paid you after receiving your letters and notices of sale?

A: Sure.

Q: Is "sure" the same thing as yes?

— 40 —

A: I don't know. Look it up.

Q: When you say "sure," do you mean yes?

A: In this case, yeah.

**Kolkman Third Dep. 82:9–19**

Q: When they call, do you tell them how much they can pay to stop the sale?

A: Yes.

Q: When they call, do you offer them a way to pay?

A: Yeah.

Q: And the offer – they can pay you right there on the phone and give you a credit card number?

A: Yes.

Q: And you'll accept that payment and keep that payment to stop the sale?

A: Yes.

**Kolkman Third Dep. 83:7–17**

Q: Do you tell debtors that they don't have to pay, and if they don't pay, you won't seize their property?

A: No, I do not.

Q: Do you tell them if they don't pay, you will seize their property?

A: There is that possibility.

Q: You tell them that? That's what you tell them? I'm not asking if it's a possibility, I'm asking if you tell them it's a possibility?

A: Yes.

**Kolkman Third Dep. 93:5-94:9**

Q: When was the last time you served a writ of execution?

A: That I served?

Q: Your office.

A: I don't know.

Q: When was the last time you've served one?

A: Been a while.

Q: Explain. How long?

A: I work at the office, and I work the other side. Okay. Let me think. Constable Kolkman? Never have.

Q: You've never served a writ of execution for your company, Constable Kolkman, LLC?

A: No.

Q: It's always Andrew Collet or someone else?

A: Yeah.

Q: How many of those cases that – that your office has served writs of execution has it seized property?

A: At the time of service?

Q: Yeah.

A: None.

Q: How many writs of execution has your office served in the last three years and seized property ever?

A: Don't know.

Q: Can you identify any cases where you've ever seized property?

A: Not right off.

**Kolkman Third Dep. 96:15-17**

Q: Can you think of a number of how many executions you've actually sold?

A: Zero.

**Kolkman Third Dep. 97:12–18**

Q: When you send these letters notifying a debtor of a sale, do you ever arrange for movers, trucks, or storage?

A: No.

Q: Do you ever advertise these sales in the public?

A: No.

**Kolkman Third Dep. 104:3–7**

Q: And you continue to send out notices of sales today as of now, correct?

A: Yes.

Q: And have you started holding the sales now?

A: Not yet.

**Kolkman Third Dep. 110:7-22**

Q: And Olson Shaner is aware that you're sending these notices of sale?

A: Yeah.

Q: And they didn't say stop doing that?

A: No.

Q: Did NAR ever say stop sending notices of sale?

— 42 —

A: No.

Q: And Olson Shaner and NAR, they're aware that you don't hold the sale?

A: I don't know if they ever or not.

Q: Have you ever notified them that you actually performed a sale?

A: I haven't had to.

**Kolkman Third Dep. 111:8–14**

Q: How often do you share payments with Olson Shaner or NAR?

A: Probably once a week.

Q: And how often do they send you writs of execution?

A: Once a week.

Q: And that's … been the pattern for the last couple of years?

A: Yes.

CONSTABLE KOLKMAN LLC — 30(b)(6) DEPOSITION
JULY 28, 2025.

**Kolkman LLC 30(b)(6) 8:21–9:3**

Q: So let's start in general terms. We're here for Constable Kolkman LLC, correct?

A: Correct.

Q: What is it that Constable Kolkman LLC does?

A: Constable Kolkman LLC handles the process of Writ of Executions.

Q: Okay. Does it do anything other than handles the process of Writ of Executions?

A: No.

**Kolkman LLC 30(b)(6) 9:7–20**

Q: Who owns Constable Kolkman LLC?

A: Rob Kolkman.

Q: Anyone else?

A: No.

Q: And so the only thing that Constable Kolkman does to generate revenue is, you said, handles the process of writs of execution; is that right?

A: Correct.

Q: So Constable Kolkman LLC doesn't serve subpoenas?

A: Hasn't.

**Kolkman LLC 30(b)(6) 10:5-16**

Q: As of today, Constable Kolkman LLC does not serve summons – or subpoenas, excuse me, that's correct?

A: Yes.

Q: Okay. And it doesn't serve summons or complaints?

A: Yes.

Q: And it doesn't serve writs of garnishment?

A: Yes.

Q: And it doesn't serve any other legal papers except writs of execution?

A: Yes.

**Kolkman LLC 30(b)(6) 21:8–9**

Q: Would Rob Kolkman ever answer the phone and handle payments?

A: Rob Kolkman took some payments, as well.

**Kolkman LLC 30(b)(6) 29:22-30:12**

Q: The company started in January of 2023; is that correct?

A: Yes.

Q: And it started when Rob Kolkman took over the Writ of Execution process for Michael Erickson?

A: Yes.

Q: When the company took over from Michael Erickson, it took over certain clients. Those were NAR, Olson Shaner, Mountain Land, and Cherrington; is that correct?

A: Yes.

Q: Did it also take over any other clients from Michael Erickson?

A: All of the billing and collections for a short period of time.

**Kolkman LLC 30(b)(6) 33:2-9**

Q: And Constable Kolkman LLC took some employees and some software from Michael Erickson and some clients. Did they also take the letter templates?

A: Yes.

Q: And the procedures that Michael Erickson was following, Constable Kolkman LLC continued those procedures?

A: Yes.

**Kolkman LLC 30(b)(6) 34:14-18**

Q: Did you – well, all of this transfer, the employees, the software, the letter templates, the procedures, the office equipment, all of that occurred after January 1, 2023?

A: Correct.

**Kolkman LLC 30(b)(6) 34:19-35:19**

Q: Okay. Tell me about Rob Kolkman and his involvement with the daily operations of the company. What was his role in the company?

A: He's the constable. Well, was the constable.

Q: And he managed the daily operations of the company?

A: Yes, we both did.

Q: Okay. But you answered to him. If he said do something, you did it?

A: Correct.

Q: And if he said don't do something, you didn't do it?

A: Correct.

Q: So any decisions were made or authorized by him?

A: Correct.

Q: Is it also fair to say that the decisions that were made were also authorized by you or made by you?

A: Restate this question, please?

Q: Decisions that the company made, were they made by you and then approved by him, or were they made by him and then given to you?

A: Company decisions were made by Rob Kolkman.

**Kolkman LLC 30(b)(6) 48:23–25**

Q: In 98 percent of cases what happens?

A: The defendant wants to clear the matter up and asks if they can make payments.

**Kolkman LLC 30(b)(6) 49:3-15**

Q: Do people ever call up and say, I got this Writ of Execution and letter and I don't understand it, and then you explain to them what it is?

A: Yes.

Q: And do you offer the payment plan, or do they always – are you saying they always bring it up, not you?

A: I explain to them the Writ of Execution. I let the defendant decide what they believe would be the best option for them.

Q: And that option is always paying a payment plan; not getting their stuff seized?

A: Correct.

**Kolkman LLC 30(b)(6) 55:11–23**

Q: We went through these other constables and deputies. Let's make sure I'm clear on this. We have Rob Kolkman, Andrew Collett, and Andrew Vargas?

A: Yes. We've already been through this.

Q: And none of these ever served anything other than a Writ of Execution for Constable Kolkman LLC?

A: Yes.

Q: And none of them ever seized any property for Constable Kolkman LLC?

A: Correct.

Q: And none of them ever held the sale?

A: Correct.

**Kolkman LLC 30(b)(6) 78:2-15**

Q: Okay. And how much total has the company collected since January 1st, 2023?

A: Approximately? Do you – okay. We need clarification on this question, okay? Do you want to know how much the company has collected or how much the company collected that went towards Writ of Execution fees?

Q: I would like to know the total amount the company collected.

A: With – with money that was for Plaintiff amounts as well?

Q: The total number of money the company has received since January 1st, 2023.

A: 3.5 million.

**Kolkman LLC 30(b)(6) 85:15-86:6**

Q: Who provided Constable Kolkman LLC with this Writ of Execution?

A: Olson Shaner.

Q: And do you know how many other writs of execution Olson Shaner gave the company when it gave you this one?

A: At the time we received this one?

Q: Yes.

A: I do not, but I can give you an estimate.

Q: Please.

A: Thirty to 50.

Q: And that's a normal amount to receive?

A: That is a normal amount to receive each week.

Q: Okay. Thirty to 50 per week?

A: Sometimes, none; sometimes more. But if you want an average, that would be the average.

**Kolkman LLC 30(b)(6) 137:9-14**

Q: What percentage of defendants do you mail these letters to who ultimately call you and make a payment?

A: What percentage?

Q: Yeah.

A: Seventy to 80 percent.

**Kolkman LLC 30(b)(6) 238:16-20**

Q: Okay. How did the company obtain all of the plaintiffs that it serves?

A: When Michael Erickson transferred everything over to Rob Kolkman, the plaintiffs came with that.

DATED 4/13/2026     /s/ Eric Stephenson

             Attorney for the Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on 4/13/2026 I served the foregoing PLAINTIFF'S

DEPOSITION DESIGNATION to Defendants' counsel of record through this

Court's electronic filing system.

/s/ Eric Stephenson

*Attorney for Plaintiff*