# Legal Trends Report

Published by Clio





Lawyers are wasting time—and losing endless opportunities to enhance their personal and professional lives as a result.

Across the board, we see a disconnect between where law firms are focusing their energy and where they could have the greatest impact. Legal professionals—from lawyers to paralegals and administrative assistants—are devoting a significant portion of their time to tasks that may not be bringing value to their firms. Meanwhile, prospective clients are waiting on emails and phone calls that go unanswered while existing clients want to use payment options that law firms don't offer.

In other words, something is broken in the legal profession— particularly in the ways that firms are servicing their clients. To overcome these issues, legal professionals' days need to fundamentally change, from where they spend their time to the value they bring to their work.

Fortunately, an unprecedented resolution promises to support firms in overcoming these challenges.

## Artificial intelligence offers a solution

Artificial intelligence (AI) has already made its mark on the legal profession—and promises to radically transform where legal professionals spend their time and energy. From everyday legal work to marketing and client relationship management, automation is helping firms focus their time and expand their capacity to provide legal services.

The modern law firm is ripe for automation—nearly three-quarters of a law firm's hourly billable tasks are potentially exposed to automation by AI. To that end, automation can offer firms the space to focus on the tasks that require a human touch—like high-level legal work, advocacy, and fostering client relationships—while maintaining a high level of service.

## Incremental changes lead to an outsized impact

The vast majority of firms have already adopted AI in their practices— but to truly change how the legal profession services clients, firms need to focus on mindset.

Many firms find themselves stuck in assumptive decision-making patterns— like where they should spend their money or what payment options their clients want—that aren't serving them or their clients.

Here, data can help. Understanding which investments are empowering firms to improve productivity and grow their businesses, and what their clients are looking for, can help firms make informed, data-driven decisions and support their lasting success.

Change doesn't happen overnight, though. Building new habits—whether it's integrating automation into your law firm's daily operations, improving client intake, or expanding your payment offerings—requires commitment. But, in building these new habits, firms can position themselves on a path to success, and with time, these practices become ingrained in the background of your firm.



## DATA SOURCES

The *Legal Trends Report* uses a range of methodological approaches and data sources to deliver the best insights about the state of legal practice and strategies for future growth.

### Clio data

We've analyzed aggregated and anonymized data from tens of thousands of legal professionals in the U.S. This data provides important insights about how technology is currently being used by legal professionals, as well as its impact on firm performance.

### Survey of legal professionals

We surveyed 1,028 U.S. legal professionals from June 5 to June 23, 2024. The legal professionals we surveyed included lawyers as well as support staff—such as paralegals and administrators—who are engaged in the management side of their practice. Additionally, we surveyed 1,437 Clio customers from April 15 to 25, 2024.

### Survey of the general population

We surveyed 1,003 adults in the U.S. general population from June 28 to July 2, 2024. This survey was designed to gauge attitudes, opinions, preferences, and behaviors regarding the legal profession among individuals who have hired lawyers in the past or who may become potential legal clients in the future. This sample is representative of the U.S. population by age, gender, region, income, and race/ethnicity based on the most recent U.S. census statistics.

### Email, phone, chatbot, and intake form outreach

We contacted a random sample of 500 law firms in the U.S. from June 20 to July 5, 2024, via four channels (email, phone, chatbot, and intake form) to determine just how prepared lawyers are to earn the business of potential clients when they reach out. In doing so, we've collected the largest primary dataset on law firm responsiveness—which puts a spotlight on key opportunities for law firms to be truly competitive in acquiring new clients.

### Automation analysis

We utilized an internally-hosted large language model (LLM) to map Clio Manage work activities to activities in the Occupational Information Network (O*NET) Database that are applicable to the practice of law. We then used ChatGPT-4 to determine to what extent each O*NET work activity could be automated with AI. The LLM assigned an automation score between 0 (no potential for automation) and 100% (completely automatable) and provided a justification, which we used to evaluate and refine our study. From this analysis, we determined to what degree each type of work could be taken on by AI.

Next, we used a dataset of over 7 million time entries from anonymized and aggregated billing data from tens of thousands of lawyers and categorized them according to the standardized work activities provided in the O*NET Database. In doing so, we've compared the automation potential for certain types of work with respect to how much that work contributes to firm revenues in the form of hourly work.

### Law firm financial statements

We partnered with Clio-Certified Consultant, CPN Legal, to source historical, anonymized profit and loss reports and balance statements from 122 law firms. The historical statements cover decades of law firm finances from solo, small, and medium-sized law firms.



# AI Is Disrupting the Legal Industry

**LEGAL
TRENDS
REPORT**
PUBLISHED BY CLIO

There's no doubt about it: legal professionals are truly embracing artificial intelligence (AI)—and with it, the promise of rapid transformation in the practice of law. Seventy-nine percent of legal professionals have adopted AI in some way, and one in four use it widely or universally in their law firms.

However, the rapid adoption of AI in the legal profession also brings challenges and uncertainty. Recent research from Goldman Sachs suggests that AI could automate a significant proportion of legal tasks and that the majority of legal professionals will see AI complement or augment their work in some way—with a worrying percentage of employment in legal expected to "likely" be replaced by AI.

Our own research aims to better understand the implications of automation on law firm services and pricing models. We found that nearly three-quarters of law firms' hourly work could be potentially automated by AI, which stands to have a dramatic impact on firm revenues.

The challenges inherent in AI adoption are only one side of the story within the legal profession, though. While AI adoption will require many in legal to reconsider their roles within law firms and how they provide legal services, it also presents a unique opportunity to create a new and better vision for the practice of law.

To understand this opportunity, we've analyzed how AI is fast becoming integral to the legal industry and the untold automation potential of everyday legal tasks, offering a refined analysis of its impact on the legal profession.

*No legal role will be unaffected by AI.*

# Can the legal profession be automated?

*In 2023, Goldman Sachs [published a study](#) saying that 44% of work tasks performed in the legal industry could be automated by AI, and AI could potentially replace 40% of legal industry employees.*

To conduct this study, Goldman Sachs analyzed the automation potential of occupational categories taken from the O*NET Database—which contains hundreds of standardized occupation-specific descriptions for almost 1,000 occupations in the U.S. In looking at several occupations, they determined automation potential based on generic, high-level work activities.

To better understand the potential impact of AI automation on *revenue-generating work* in law firms, we undertook a more refined analysis that included detailed work categories in the O*NET database, and we compared them to aggregated and anonymized billing data from tens of thousands of legal professionals.

## Calculating automation

Our analysis focuses on **automation potential**, referring to the extent to which particular tasks in a law firm can be automated. For example, if a task typically takes 10 hours to complete and has an automation potential of 50%, a law firm could expect that same task to account for only five hours of billable time.



*How did we assess automation potential?*

We utilized an internally-hosted large language model (LLM) to assess the work activities in the O*NET Database that are applicable to the practice of law. We used this LLM to determine to what extent each activity could be automated with AI. The LLM assigned an automation score between 0 (no potential for automation) and 100% (completely automatable) and provided a justification, which we used to evaluate and refine our study. From this analysis, we determined to what degree each type of work could be taken on by AI.

Next, we used a dataset of over 7 million time entries from anonymized and aggregated billing data from tens of thousands of lawyers and categorized them according to the standardized work activities provided in the O*NET Database. In doing so, we've compared the automation potential for certain types of work with respect to how much that work contributes to firm revenues in the form of hourly work.

# How "automatable" is the modern law firm?

Our analysis indicates that nearly three-quarters of a law firm's hourly billable tasks are potentially exposed to automation by AI.

**74%**
(Entire industry average)

AI won't be able to take on all types of billable work in a law firm, but the work done by certain roles is more "automatable" than others. For example, 81% of hourly billable work performed by administrative assistants has potential for automation, while 57% of hourly work performed by lawyers has automation potential.

## The automation potential of law firm roles



Lawyers **57%**

Paralegals **69%**

Administrative Assistants **81%**

## AI presents opportunities for growth

As AI becomes an integral tool in modern law firms, legal professionals will need to evolve. At the same time, every law firm is different. While a significant amount of hourly work could be automated with AI, this could affect firms in different ways.

For firms grappling with the implications for their staff's roles and responsibilities, there are many opportunities to consider.

Here are just a few possibilities:





▶ Law firm staff can refocus on delivering better, more client-centered services—an invaluable aspect of law firm business development that cannot easily be automated.

▶ As firms and their legal staff grow more efficient and productive in accomplishing legal work with AI, firm staff can devote more time to marketing their services and attracting new clients to strengthen their pipeline.

▶ AI's effectiveness depends on whether staff have the knowledge and skills to make the most of it. Focusing on AI training can help firms ensure all staff members leverage AI to its fullest potential, including navigating tools, using effective prompts, and avoiding (or identifying) AI-created errors.



# Which legal tasks are ripe for automation?

When we look closer at which types of work have the most potential for automation, it's no surprise that the most information-heavy tasks are the most automatable, such as:

- Documenting and recording information

- Getting information

- Analyzing data or information

As it happens, the most automatable activities are also the three largest activities as measured by share of hourly billing. Together, this work accounts for 66% of the hourly billable work taken on by the average law firm, which shows which aspects of a firm's business are most ripe for innovation.

These results also show us which tasks have less potential for automation. For example, while *providing consultation and advice* makes up a significant proportion of billable work (15%), it has much lower automation potential (23%) than many other tasks. This means that this could be an area where firms continue to rely on staff members to bill by the hour. Similarly, *developing objectives and strategies* typically makes up a small amount of hourly revenue (1%) and also has low automation potential (20%).

If firms implement more AI technologies to automate the more menial, information-heavy work related to document drafting and review, they may have more opportunity to take on more higher-value, strategic work with clients. In turn, this higher-value work could also warrant higher hourly rates.

## Activities with the highest automation scores in the legal industry

■ Share of hourly billing    ⬚ Automation potential

**26%** Documenting and recording information
**86%**
- Prepare legal documents
- Prepare documentation of legal proceedings

**21%** Getting information

**19%** Analyzing data or information
**70%**
- Examine legal data to determine advisability of defending or prosecuting lawsuit
- Search for and examine public and other legal records to write opinions or establish ownership
- Gather evidence to formulate defense or initiate legal actions by such means as interviewing clients and witnesses to ascertain the facts of a case
- Select jurors, argue motions, meet with judges, and question witnesses during the course of a trial
- Study Constitution, statutes, decisions, regulations, and ordinances of quasi-judicial bodies to determine ramifications for cases

**15%**
**23%**
Providing consultation and advice to others

**6%**
**21%**
Communicating with people outside the organization

**5%**
**20%**
Guiding, directing, and motivating subordinates

**4%**
**30%**
Resolving conflicts and negotiating with others
**69%**
- Evaluate findings and develop strategies and arguments in preparation for presentation of cases
- Examine legal data to determine advisability of defending or prosecuting lawsuit
- Study Constitution, statutes, decisions, regulations, and ordinances of quasi-judicial bodies to determine ramifications for cases
- Analyze the probable outcomes of cases using knowledge of legal precedents

**2%**
**45%**
Communicating with supervisors, peers, or subordinates

**1%**
**20%**
Developing objectives and strategies

## Documenting and recording information

Many aspects of legal document preparation are repetitive and standardized, making them ripe for automation. With AI tools being particularly adept at processing and creating written information, these tasks are an area where the legal profession can expect to see significant disruption.

## Frequency and automation potential of documenting and recording information subtasks



■ Share of hourly billing      ⬚ Automation potential

98%

86%

Prepare legal documents

2%

70%

Prepare documentation of legal proceedings

## Getting information

The data-heavy nature of these activities makes them particularly open to automation, given that AI tools are adept at consuming and processing information. In fact, generative AI is often trained by "feeding" it vast amounts of data.

## Frequency and automation potential of getting information subtasks



■ Share of hourly billing      ⬚ Automation potential

62%

70%

Examine legal data to determine advisability of defending or prosecuting lawsuit

35%

70%

Search for and examine public and other legal records to write opinions or establish ownership

2%

70%

Gather evidence to formulate defense or initiate legal actions by such means as interviewing clients and witnesses to ascertain the facts of a case

1%

65%

Select jurors, argue motions, meet with judges, and question witnesses during the course of a trial

1%

30%

Study Constitution, statutes, decisions, regulations, and ordinances of quasi-judicial bodies to determine ramifications for cases

## Analyzing data or information

A high automation score for *analyzing data or information* may be somewhat surprising, yet this is another category where automation has significant disruption potential.

Think about it this way: AI can analyze vast datasets to identify trends, patterns, and correlations that might not be immediately apparent to a human. For example, by analyzing all decisions rendered by a particular judge, AI may be able to glean insights into their decision-making process, helping lawyers to evaluate the effectiveness of potential legal arguments for an upcoming trial before that same judge.



# Frequency and automation of analyzing data or information subtasks

■ Share of hourly billing     ⬚ Automation potential

**81%**
70%
Evaluate findings and develop strategies and arguments in preparation for presentation of cases

**9%**
70%
Examine legal data to determine advisability of defending or prosecuting lawsuit

**7%**
70%
Study Constitution, statutes, decisions, regulations, and ordinances of quasi-judicial bodies to determine ramifications for cases

**3%**
60%
Analyze the probable outcomes of cases using knowledge of legal precedents



# The impact of automation on billed time

AI's automation potential is set to dramatically impact how law firms operate and deliver legal services to clients. At the same time, for firms that predominantly bill by the hour, it presents a significant challenge for revenue. AI automation ultimately results in spending less time on a case, which means the firm has less to bill for.

In fact, the American Bar Association's Formal Opinion 512 on generative artificial intelligence tools states that lawyers may only charge for the actual time spent on tasks (even if AI allows them to perform these tasks faster).

Based on what clients have paid historically, the three most automatable tasks generated, on average, at least $36,000 in revenue per lawyer annually. When factoring in how much of this work can be automated, generative AI could put $27,000 of annual revenue at risk for every lawyer who sticks to hourly billing. In other words, firms that adopt AI automation and don't adjust their billing models could see this revenue evaporate.

At the same time, AI's automation potential presents significant opportunities for law firms to free up time for more billable work—meaning that, when used the right way and in conjunction with the right billing models, automation presents far more opportunities than challenges when it comes to revenue.

## Is automation paving the way for flat fee and hybrid billing models?

At first glance, it could look like AI is a major threat to the hourly billing model that so many law firms rely on. However, many firms today are shifting to value-based billing, like flat fee models, that offer more transparency and predictability for clients. For example, since 2016, the proportion of flat fee billed amounts has increased by approximately 34% (read more about hourly versus flat fee billing in "Flat Fees and the Future of Law Firm Billing Models"). For firms that bill work based on fixed fees, these increases in efficiency stand to increase the overall case volume—and associated earnings—that a firm takes on.

Alternatively, a hybrid billing model—where legal professionals charge flat fees for automated tasks and rely on hourly billing for work (or aspects of it) that requires human expertise—could provide firms with the opportunity to integrate flat fees into their businesses while retaining hourly billing for more hands-on work performed by legal professionals.

It's more important now than ever for firms to know both the risks and the opportunities that lie ahead for their businesses. In terms of revenue generation, this means taking a close look at where AI can take on more of the day-to-day work and where firms will need to remain more hands-on. With this knowledge, firms can adapt their service models to better suit the rapidly-evolving landscape for legal services.

# AI automation could (reduce) hourly billing per lawyer by $27,000 annually.





# The rapid uptick in law firm AI adoption

AI presents tremendous potential for law firms—if they're prepared to adopt it. But how do law firms feel about AI at this time?

When we last researched AI in 2023, 19% of law firms were using AI in their practice.

Over the last year, that number has skyrocketed: a whopping 79% of surveyed legal professionals are now using AI in some capacity in their practice, while 25% have adopted AI widely or universally.

### The vast majority of lawyers have adopted AI in some capacity



**8%** Universal adoption
**17%** Wide adoption
**21%** Partial adoption
**34%** Minimal adoption
**21%** Not adopted at all

**79%** Total adoption

Surprisingly, lawyers are adopting AI at a faster rate than in other industries. A recent survey by McKinsey & Company that looked at the full spectrum of industries and professions found that 72% of organizations have adopted AI in at least one business function. This average falls below what we're seeing among law firms, which means we may be seeing a historical first wherein the legal profession is leading the way in the adoption of new technology.

AI adoption is no longer limited to legal trailblazers—it's the new normal in law firms. Regardless of where firms stand on AI adoption, it's time to start thinking critically about the impact of AI on law firm operations and legal services.

## *What's holding legal professionals back from being "AI champions"?*

We asked Clio customers—ranging from lawyers to paralegals and support staff—about their thoughts on future AI use in their law firms and where their hesitations lie. We found that lawyers who are unsure about using AI in the future tend to have more concerns about AI use than paralegals and administrative staff.

*Of those legal professionals who are unsure about using AI in the future:*

|  | *Lawyers* | *Paralegals* | *Administrative Staff* |
|---|---|---|---|
| Unsure it will help with work | 59% | 42% | 40% |
| Don't trust it | 44% | 17% | 28% |
| Think it's unreliable | 34% | 13% | 21% |
| Think it's not advanced enough | 30% | 8% | 17% |

### Messaging matters

Convincing law firm staff to adopt AI may require different approaches depending on their position. For example, lawyers may be more concerned than paralegals and administrative staff about whether AI is advanced enough to be reliable, while non-lawyer staff who are on the fence may need more information on how AI can help them with their work.

### Law firms are investing heavily in technology

Since 2012, the amount that firms spend on software has grown at an annual rate of 20.76%, surpassing revenue growth, which averaged 8.82% each year over the same period. This suggests that law firms are shifting more of their resources towards technology to enhance efficiency and scalability.

What types of technology do firms plan to invest in? AI is a major focus for many: more than four in five (84%) firms believe that AI will increase over the next 12 months. Even among firms that have yet to adopt AI, 68% say their use of AI will increase over the next 12 months.

## Most law firms believe AI usage will increase in the next 12 months



*84%* of all law firms believe AI usage will increase

*68%* of law firms **not** using AI believe AI usage will increase

Want to learn more about law firm spending habits? Read "How Law Firms Spend for Growth."

## Most clients are copacetic to law firms that use AI

Nearly half of all clients would prefer to work with law firms that use AI, which suggests that they see AI as a means of offering better, more efficient legal services than firms not using AI.

Cumulatively, 70% of clients are either agnostic or would prefer to work with firms that use AI—meaning that the vast majority of clients either want their lawyers to use AI or are amenable.

This number is likely to increase when we consider how quickly consumer attitudes surrounding AI use have shifted. In the *2023 Legal Trends Report*, only 46% of consumers said they were open to working with law firms that used AI-powered software.

*The generational opportunity: client preferences on AI in law firms*

The majority of clients across generations would either be open to or even prefer lawyers using AI. Younger generations are more amenable to AI usage, with the vast majority of Gen Z and Millennial clients either preferring or having no objections to hiring a law firm that has adopted AI-powered software.

According to the most recent national census in 2020, Millennials are the largest generation group in the United States at 22% of the total population. Gen Z follows closely behind at approximately 20% of the total population. Altogether, more than half of Americans are of Millennial age or younger. In fact, according to a 2021 study by the Institute for the Advancement of the American Legal System, younger generations are more likely to experience legal problems (74% of 19-to-29-year-olds and 71% of 30-to-44-year-olds).

With this growing demographic shift, as younger generations age and become familiar with AI, it's likely that even more clients will be more open to—and could come to expect—firms adopting the types of capabilities associated with AI.



Openness to law firms using AI

**Know what your clients want**

Understanding generational preferences can help law firms build trust and satisfaction among their client base. For example, law firms that typically serve a younger client base may be better positioned to adopt client-facing AI tools, such as chatbots.

## If you were looking to hire a lawyer, which of the following would you prefer?



*Client preferences on AI usage*

Law firm using or exploring AI — 42%   No preference — 28%   Law firms not using AI — 31%



# What AI solutions are being adopted—and what are they being used for?

The legal industry is increasingly adopting a variety of AI-powered technology to enhance efficiency and accuracy, with the top three solutions being:

1. **Generic non-legal AI tools (e.g., ChatGPT):** These allow firms to perform tasks like high-level drafting work.

2. **AI-powered legal research platforms:** These allow firms to quickly access legal research databases, predict case outcomes, and much more.

3. **Document drafting tools:** These enable firms to create legal documents in less time and with fewer errors.

These results align with the tasks we identified as having the highest automation potential—namely, using non-legal AI tools and document drafting tools to document and record information and AI-powered legal research platforms to get information. Thus, law firms adopting AI tend to align their use of AI with tasks that are highly automatable.

## Top AI-powered solutions in the legal industry



| | |
|---|---|
| 36% | Generic non-legal AI tools |
| 33% | Legal research platforms |
| 18% | Document drafting |
| 12% | E-discovery |
| 11% | Contract review |
| 10% | Virtual receptionist |
| 9% | Predictive legal analytics |
| 1% | Other |
| 18% | None of the above |

*Leveraging legal-specific AI tools can help firms make the most of AI while managing potential security issues they might face using generic, non-legal AI tools.*

For example, Clio Duo, our AI built into Clio Manage, can seamlessly access information and help you make the most of your day while keeping your data secure, stable, and compliant.

[Learn more about Clio Duo.](#)

# Time savings and efficiency are motivators for AI

AI use in the legal industry has increased over time—and lawyers anticipate that it will continue to do so. But *why* are so many law firms adopting AI at such a rapid pace? The perceived benefits are likely a key motivating factor.

Legal professionals believe that AI will save them time and money while increasing their quality of work and productivity. Most importantly, firms that adopt AI are more likely to see these benefits.

Legal professionals using AI widely at their firms report even more benefits. They are more likely to believe that AI:

- Improves the quality of their work

- Helps them manage caseloads more productively

- Improves client experience and satisfaction

- Increases their firm's revenue

These results suggest that when firms fully integrate AI into their operations, the benefits become even more pronounced.

**The perceived benefits of AI among legal professionals**



| | |
|---|---|
| **54%** Saves me time and increases efficiency | **36%** Improves the quality of my work |
| **35%** Helps me manage my caseloads more productively | **34%** Saves me and my firm money |
| | **23%** Improves client experience or satisfaction |
| **22%** Increases my firm's revenue | **21%** Enables me to work remotely |
| | **20%** Enhances collaboration at my firm or practice |
| **19%** Helps me grow my business | **15%** Improves data security  **15%** Helps me mitigate risk |



## Legal professionals trust AI to help with a variety of tasks

Legal professionals not only see the benefits of AI—they also place significant trust in it.

*Legal professionals are most likely to trust AI with:*

- ▶ Generating marketing content
- ▶ Finding information in documents
- ▶ Finding client and case matter information
- ▶ Creating and running reports
- ▶ Syncing information across tools

*Legal professionals are slightly less likely to trust AI with:*

- ▶ Drafting client communications
- ▶ Conducting legal research
- ▶ Vetting or intaking new clients

## Legal professionals trust AI to help with certain tasks

% who trust AI to any degree for the following

| % | Task |
|---|---|
| 87% | Generating marketing content |
| 87% | Finding information in documents |
| 85% | Finding client/case/matter information in Clio |
| 85% | Creating and running reports |
| 85% | Syncing information across tools and software |
| 84% | Organizing digital documents and files |
| 84% | Summarizing documents |
| 82% | Keeping track of client information from phone calls |
| 81% | Tracking time |
| 78% | Prioritizing daily tasks |
| 77% | Planning and scheduling meetings |
| 77% | Generating bills |
| 76% | Drafting documents |
| 73% | Drafting client communications |
| 73% | Conducting legal research |
| 64% | Vetting and intaking new clients |

According to a survey of Clio customers, legal professionals appear to be less trusting of AI for tasks needing high client interaction and legal expertise. However, they are more confident in AI for drafting and information gathering, such as creating marketing content or finding information.



## Don't lose sight of your ethical duties

Remember: when using AI, similar to using any other technology, lawyers have a duty to uphold their ethical duties to clients in providing competent legal representation.

In July 2024, the American Bar Association released Formal Opinion 512 on general artificial intelligence tools. This document reiterates that lawyers must fully consider their applicable ethical obligations when leveraging AI tools, including their duties to provide competent representation, protect client information, supervise employees and agents, and charge reasonable fees.



# The future is here: what does AI mean for you?

*AI could automate nearly 75% of hourly billable work in law firms.*

With nearly three-quarters of billable work potentially automatable, AI promises to transform how law firms operate. What does this mean for you? By focusing on key areas, law firms can adapt to AI, ensuring competitiveness, efficiency, and client satisfaction.

## Stay ahead or fall behind

- **Adopt AI to stay competitive:** With the vast majority of law firms already leveraging AI, those going without may soon find themselves outpaced by AI-enabled legal service providers.

- **Go beyond initial tech implementation:** Considering which AI tools to implement and how they'll be used is only the beginning. The rise of generative AI will require law firms to think differently about the services they provide and how they shape the legal experience.

## Budget wisely

- **Monitor AI-related spending carefully:** Already, law firms are spending more and more on legal software—and this spending is exceeding law firm revenue growth.

- **Ensure tech investments align with long-term goals:** Firms will need to closely monitor their technological investments—and their impact on firm performance—to ensure they align with future goals. Consider areas where AI offers the most "bang for your buck," especially in areas with high automation potential.

## Grow your client base

- **Increased productivity presents an opportunity to focus on client acquisition:** While AI-based efficiencies offer significant benefits in terms of productivity and accuracy, firms must also focus on client acquisition to ensure that these efficiencies translate into growth.

- **Efficient operations require a strong client pipeline:** Firms leveraging AI may need to focus on more proactive marketing efforts to attract new clients and maintain a steady workload.

- **Implement proactive marketing and client management strategies:** This also allows legal professionals to focus on client-facing tasks, one area where they are less likely to trust—or want to rely on—AI tools.

## Rethink traditional billing

- **Hourly billing may become less viable with AI efficiencies:** While there will likely be a case for hourly billing in the immediate future, automation and AI are accelerating an ongoing trend of moving towards flat fee billing. Notably, while AI can help handle legal tasks more efficiently, the hours billed per case are likely to decrease—and with that, a dip in revenue per case. Furthermore, regulators are taking note of the challenges inherent in hourly billing when AI tools are involved.

- **Consider flat fee or hybrid billing to maintain revenue predictability:** Flat fee billing can help sustain revenue for individual cases and provide greater predictability for revenue-generating work that is impacted by AI. This adaptability could allow firms to enhance productivity and profitably simultaneously, positioning them favorably in an increasingly competitive landscape. Alternatively, the automation potential of law firm tasks may lead to the rise of hybrid billing models, where legal professionals charge flat fees for automated tasks and hourly billing for more hands-on work.



# Flat Fees and the Future of Law Firm Billing



 **LEGAL TRENDS REPORT** PUBLISHED BY CLIO

With the prevalence of hourly billing in the legal industry, legal professionals have often faced challenges surrounding the disconnect between the time and expertise required for legal work and the client-perceived value of the outcome. Certain legal tasks that a client may see as having moderate value may be highly time-intensive for a lawyer to complete and, if billed by the hour, quite costly to the client.

The use of AI in law firms is beginning to make this disconnect more apparent. Work that might have taken hours may only take a fraction of the time with AI. With nearly three-quarters of law firms' hourly revenue being exposed to automation from AI, that automation potential is poised to bring about a wholesale shift in the ways legal professionals provide services to their clients and receive payment for their work.

Today, over 80% of law firm revenue comes from hourly work. If firms are leveraging AI for tasks that are billed by the hour, they will likely see revenue per case decline (as fewer hours are billed), requiring an increase in client volume—or a reconsideration of firm billing frameworks.

Three-quarters of law firm hourly revenue could be automated by AI

80% of law firm revenue comes from hourly work

Incorporating flat fee billing can help law firms maintain pricing and revenue for individual cases while creating more predictability for revenue-generating work.

Flat fees are nothing new. Many firms are already leveraging flat fee billing as an alternative to—or in conjunction with—hourly billing. However, the widespread adoption of AI may further incentivize the legal profession to adopt more flat fee models.

## What is flat fee billing?

Flat fee billing refers to pricing strategies where a law firm charges a specified fee for a specific job or project. This flat fee remains consistent regardless of how long it takes to complete the project or the resources involved.

Charging $1,000 to draft an individual will, inclusive of all tasks relating to the final work product, is an example of flat fee billing.

*AI is poised to bring about a wholesale shift in the ways legal professionals provide services to their clients and receive payment for their work.*


LEGAL
TRENDS
REPORT

# Use of flat fee pricing is growing

While hourly billing is undoubtedly the most popular method of law firm billing, there is growing interest in flat fee billing among law firms.

In the last year alone (coinciding with a significant increase in AI adoption among legal professionals), flat fee billable and billed amounts increased by almost 6%, representing an acceleration in flat fee adoption among law firms.

However, even without the influence of AI, firms have been steadily shifting to flat fee billing models over time. Since 2016, flat fee billable amounts have grown by 20%, and billed amounts have grown by 34%.

## The proportion of revenue from flat fees has grown over time



■ Flat fees  ■ Hourly billing

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Hourly billing | 85% | 83% | 84% | 83% | 83% | 82% | 81% | 81% |
| Flat fees | 15% | 17% | 16% | 17% | 17% | 18% | 19% | 19% |

## Flat fee billings have grown since 2016



**34%**

Growth in **billed** amount

**20%**

Growth in **billable** amount

| 49

## Hourly and flat fee realization rates





Flat fees    Hourly billing

66%    77%
70%    78%
75%    79%
79%    81%
82%    82%
83%    84%
83%    85%
84%    86%

60%

2016    2017    2018    2019    2020    2021    2022    2023

## How fast is recorded work billed?

Flat fees    Hourly billing





Percentage of billable work invoiced

100%

75%

50%

25%

0%

Firms billing with flat fees are over five times more likely to get bills out almost immediately than those billing hourly.

0    25    50    75    100

Days since recording time entry

# Firms get flat fee bills out more quickly

The gap between hourly and flat fee realization rates is shrinking, suggesting that law firms are becoming more efficient at managing and invoicing flat fee cases.

Firms billing with flat fees are over five times more likely to get bills out almost immediately than those billing hourly.

These results likely stem from the predictability of flat fees. For example, firms billing hourly need to review their time entries, edit down their ledgers, and possibly seek approval from other staff members before sending a bill to the client. Those billing with flat fees, on the other hand, benefit from having a predetermined fee to charge the client, thus requiring much less review and oversight at the billing stage.

Even though firms are quicker to bill for flat fee work, they get a smaller percentage of bills out overall, but this has been improving—and at a faster rate than hourly billing. As a result, the gap between hourly and flat fee realization rates (the percentage of billable work that actually gets invoiced to clients) is shrinking, suggesting that law firms are becoming more efficient at managing and invoicing flat fee cases.

# Firms are more likely to be paid almost immediately for flat fee work

Legal professionals billing with flat fees are nearly *twice as likely* as those billing hourly to collect payments almost immediately, which saves firms from having to manage and follow up with these clients.

However, when bills aren't paid right away, work that's billed on a flat fee basis is less likely to get paid overall. After 25 days past issuing a bill, those charging hourly are more likely to collect payment than those billing with flat fees. And while collection rates have been steadily improving for hourly work, they have only slightly increased for flat fee work.

For whatever reason—whether dealing with more volume or less potential revenue per case—firms billing on a flat fee basis have significant opportunities to improve on collecting payments. This could be through setting up automated bill reminders or offering clients the flexibility and convenience of having more payment options. For example, past research from the *Legal Trends Report* found that law firms using online payments get paid more than twice as fast as those going without.



### How fast is billed work collected?

**Flat fees**  **Hourly billing**

Legal professionals billing with flat fees are nearly *twice as likely* as those billing hourly to collect payments almost immediately, which saves firms from having to manage and follow up with these clients.

### Hourly and flat fee collection rates

**Flat fees**  **Hourly billing**

| Year | Flat fees | Hourly billing |
|------|-----------|----------------|
| 2016 | 75% | 87% |
| 2017 | 74% | 87% |
| 2018 | 76% | 88% |
| 2019 | 77% | 88% |
| 2020 | 78% | 88% |
| 2021 | 79% | 89% |
| 2022 | 80% | 89% |
| 2023 | 80% | 92% |

*Legal professionals billing with flat fees are nearly twice as likely as those billing hourly to collect payments almost immediately.*



*Why does offering flat fees get firms paid faster?*

**Transparency:** Clients may be more likely to pay flat fees soon after receiving a bill because they have agreed to the price upfront and understand what they will have to pay. Those paying hourly may be more likely to question the charges on their bill or need more information to understand the final cost, resulting in delayed payment.

**Tasks amenable to flat fees:** Flat fees may be used for standard, predictable tasks in law firms (for example, routine drafting tasks) with a defined work product or end date. As a result, clients may be motivated to pay their bills quickly as it is clear that the work has concluded.

**Faster billing, faster collection:** Firms billing with flat fees are over five times more likely than those billing hourly to get bills out almost immediately. Thus, clients may be more amenable to paying a bill they receive quickly, while their matter and the associated work product are still fresh in their minds.

# Firms close flat fee matters faster than hourly matters

Firms aren't just billing and getting paid for flat fee matters faster—as it turns out, matters that are billed on an hourly basis take approximately *2.6 times longer* to close compared to flat fee matters.

It could be that firms are less motivated to close hourly matters faster than flat fee matters, particularly where there is an opportunity to bill more for their services. Alternatively, firms may be more likely to bill with flat fees on matters that typically resolve within a shorter period, while hourly billing is used for cases with a more open-ended or uncertain end point.

Regardless, firms are closing flat fee matters faster overall. Over the last two years, the time to close a flat fee matter has decreased by 15% year over year for flat fee matters, while hourly matters have decreased by 8% year over year. These results suggest that firms are finding greater opportunities to streamline flat fee matters, potentially opening up the door to increased capacity for work.

# Flat fee matters are more valuable to firms today

The value of the average case billed by flat fee has grown by 51% since 2016 (after adjusting for inflation). This could be because firms are adopting this pricing framework for larger, more complex, and more valuable cases. For comparison, the value of the average case billed on an hourly basis has, for the most part, matched inflation rates during the same time period.

When adjusting for inflation, revenue from flat fee matters **has increased by 51% since 2016.**

When we break down these results by practice area, however, the results are even more profound.

*Which types of cases use flat fees the most?*



Proportion of billable work that comes from flat fees by practice area

| | |
|---|---|
| Traffic Offenses | 85% |
| Immigration | 75% |
| Criminal | 56% |
| Wills & Estates | 36% |
| Elder Law | 34% |
| Bankruptcy | 27% |
| Trusts | 25% |
| Personal Injury | 24% |
| Intellectual Property | 24% |
| Collections | 22% |
| Administrative | 20% |
| Government | 19% |
| Tax | 18% |
| Small Claims | 17% |
| Juvenile | 17% |
| Other | 17% |
| Appellate | 17% |
| Real Estate | 16% |
| Business | 12% |
| Medical Malpractice | 11% |
| Worker's Compensation | 11% |
| Mediation/Arbitration | 11% |
| Corporate | 9% |
| Contracts | 8% |
| Employment/Labor | 7% |
| Commercial/Sale of Goods | 7% |
| Insurance | 7% |
| Pro Bono | 4% |
| Family | 4% |
| Civil Litigation | 3% |
| Civil Rights/Constitutional Law | 3% |
| Construction | 2% |

Traffic offenses, immigration, and criminal matters have the highest proportions of overall billable work coming from flat fees. Notably, many litigation-heavy matters are much less likely to use flat fee billing.

Flat fee billing is also more attractive in practice areas with predictable work products (e.g., wills and estates, trusts, contracts, and business formation). While civil litigation and family law don't see flat fee billing making up the majority of their billing, 31% and 23% respectively still use them, which may be for the routine and predictable stages in their work.



# Which practice areas have the highest flat fee median case values?

## Firms may be better positioned to benefit from flat fee billing depending on their practice area.

In many cases, the median case value of a flat fee case is actually higher than its hourly counterpart.

Thirteen of the 32 practice areas studied have a flat fee median case value greater than those charging an hourly rate, meaning that firms working in these practice areas stand to earn more of their revenue from their flat fee matters.

### The top 5 median case values for flat fee billing by practice area

| Practice area | Flat fee median case value |
| --- | --- |
| Medical malpractice | $7,500 |
| Criminal | $3,500 |
| Personal injury | $2,678 |
| Administrative | $2,530 |
| Trusts | $1,900 |

## *Legal professionals versus clients: What matters most when hiring a lawyer?*

When it comes to the top factors that potential clients consider when hiring a lawyer, whether they offer hourly billing or flat fees falls surprisingly low on the list. Less than one in five potential clients would consider whether a lawyer offers flat fees, and even fewer care about whether a lawyer offers a competitive hourly rate.

More clients prioritize lawyers with experience with similar cases, reputable law firms, and positive client reviews.

Do legal professionals understand what clients are looking for when hiring a lawyer? Overall, legal professionals generally understand what matters most to clients—and what doesn't. However, when it comes to payments, legal professionals are more likely to believe that clients want lawyers who offer a competitive hourly rate and less likely to believe that clients care about flat fees, suggesting a disconnect between clients and lawyers' understanding of their preferences.

### What's important to clients when choosing a lawyer?

% who consider each a top 3 priority for clients hiring a lawyer

○ Clients    ○ Legal professionals



| | Legal professionals | Clients |
| --- | --- | --- |
| Has experience with similar cases | 43% | 50% |
| Is a reputable law firm | 39% | 41% |
| Has positive client reviews | 31% | 34% |
| Offers a fixed / flat rate | 15% | 18% |
| Offers a competitive hourly rate | 15% | 23% |

## Clients prefer paying by flat fee

Whether a law firm offers flat fee billing may not be a deciding factor for many potential clients looking to hire a lawyer. Nevertheless, paying a flat fee is the most preferred way to pay for legal services among clients.

Over half of potential clients would prefer to pay their lawyers using modern service delivery models, like flat fees or subscriptions, yet only 31% of law firms offer these payment options.

Clients who had previously hired a lawyer were even more likely to prefer flat fee billing (either as a whole or for specific tasks on a file), with 76% of respondents claiming they want to pay a flat fee for their entire case. This preference could stem from negative previous experiences with other billing options, like hourly billing, or from a positive experience with flat fee billing.

### Clients want to pay their lawyers by flat fee

- ● What clients would like
- ● What law firms offer

**Pay a flat fee for your entire case**
50%  71%

**Pay an amount that reflects how favorable the results are**
32%  56%

**Pay a flat fee for specific activities/services within a case, and get billed by the hour for the rest**
28%  51%

**Pay by the hour for services you've already recieved**
41%  71%

**Buy a monthly subscription for their services**
15%  31%

## *Lawyers aren't offering the payment options their clients want.*

*Do different generations have different billing preferences?*

Baby Boomers and Gen X are more likely than younger generations to want to pay for legal services via flat fees. About three-quarters of Baby Boomers (77%) and Gen X (74%) want to pay a flat fee for their entire legal case, compared to 66% of Millennials and 63% of Gen Z.

In other words, younger clients are less likely to want to pay for their legal case by flat fee. These results are likely because younger clients are less likely to have previously hired a lawyer. Here, we see across all generations that those who have hired a lawyer in the past have a higher preference for flat fees than those who have never hired a lawyer.

## Which billing methods are used most often?

Forty percent of clients report paying for their legal services via flat fees, making them the most frequently-reported billing method.

### More clients report paying by flat fees than law firms



● Payment option reported by clients

● Payment option offered by law firm

**40%** — FLAT FEE — **65%**

**35%** — HOURLY RATE — **71%**



However, hourly rates are the most-used billing method among firms, followed closely by flat fees. So, while firms may be more likely to offer flat fees, clients may be more likely to seek out the types of services that are billed on a flat fee basis.

# Flat fees and the rise of AI

While automation through AI stands to reduce the value of cases billed by the hour, it also poses a major opportunity for firms that charge based on a flat fee basis. Being able to work flat fee cases quicker allows them to complete more cases in a given period.

And, it appears that many law firms that have adopted AI have also adopted new billing methods: those who exclusively bill using flat fees are significantly more likely to have universally adopted AI in most areas or processes (20%) versus their non-flat fee billing counterparts (7%).

## The ethics of billing for AI-assisted work

Regulators are taking note of the challenges that AI presents for legal billing.

The American Bar Association released Formal Opinion 512 on generative artificial intelligence. This opinion states that lawyers may only charge for the actual time spent on tasks (even if AI allows them to perform these tasks faster). For firms that stand to lose hourly revenues to automation, leveraging flat fee billing models—while ensuring that fees remain reasonable—can help maintain revenue streams.



**AI-enabled law firms are more likely to exclusively bill with flat fees**

Flat fees only    Not exclusively flat fee

| | None | Minimal | Partial | Wide | Universal |
|---|---|---|---|---|---|
| Flat fees only | 10% | 17% | 24% | 30% | 20% |
| Not exclusively flat fee | 23% | 30% | 24% | 16% | 7% |

AI adoption



# Legal professionals have varied opinions on flat fee billing

Do legal professionals like flat fee billing? We see a wide range of reasons why lawyers prefer—or don't prefer—flat fee billing.

---

### Reason for using flat fees

▶ Easy to bundle/package services at affordable prices (16%)

▶ Clear for clients to know what they are spending (11%)

▶ Easier to estimate time and workload (11%)

▶ Easier budget planning (10%)

### Reason for not using flat fees

▶ We normally charge per hour (17%)

▶ Does not work well for complex litigation, cases, and tasks (17%)

▶ Case specific/depends on the service (16%)

▶ Too difficult/complicated to predict time or work required (8%)

---

For many lawyers, changing the status quo appears to be a primary concern for using flat fees.

Yet, at a time when the legal profession is changing rapidly, adhering to the status quo may ultimately hurt legal professionals. With the advent of AI, legal professionals have proven that they are ready to adopt new ways of doing things to great benefit.

## *In their own words: what do legal professionals think about flat fee billing?*

To illustrate some of the varied perspectives on flat fee billing among law firms, here's what some of our survey respondents had to say about it:

### Supporters

▶ "Flat fees provide clarity and prevent unexpected costs, fostering trust between the client and service provider."

▶ "It is easier, and in high-volume settings, keeps things simpler."

▶ "Preferred by me and my clients. [Flat fees allow] me to focus less on time billed and more on providing the best product. [They allow] the client to know what they will be spending."

### Detractors

▶ "Uniform charging may lead to irregularities in certain charges and services. Charges may be too high or too low, which may easily lead to trouble with customers."

▶ "[Flat fees do] not [accurately] capture the value [nor the] … amount of time spent working on complex issues."

▶ "It would be expensive for most clients. If the price was cheaper, I run the risk of having the case spiral to a point where I end up losing money."



# Are we witnessing the death of the billable hour?

There is—and likely always will be—a strong case for charging clients by the hour, especially when it comes to complex or complicated matters that make it difficult to foresee the amount of time and work required. Firms that commit to the process of assessing their work and bundling services accordingly stand to create more transparency for clients while opening new opportunities for efficiency and growth for themselves. Flat fee billing is already a growing trend in legal—and one that is likely to be accelerated by generative AI.



### Rethink traditional billing models

- **Hourly billing may become less viable with AI efficiencies:** Flat fee billing can help sustain revenue for individual cases and provide greater predictability for revenue-generating work that is impacted by AI. This adaptability could allow firms to enhance productivity and profitability simultaneously, positioning them favorably in an increasingly-competitive landscape. Alternatively, the automation potential of law firm tasks may lead to the rise of hybrid billing models, where legal professionals charge flat fees for automated tasks and hourly billing for more hands-on work.

- **Flat fee billing can help firms bill and get paid faster:** Flat fee cases are over five times more likely to be billed and twice as likely to be collected almost immediately than hourly cases, which may help firms who struggle in these areas.

### Keep up with the legal industry

- **Flat fees are becoming a preferred billing option in the legal profession:** Past years have demonstrated that the legal industry is increasingly leaning into flat fee billing models as a preferred payment option. As automation becomes more commonplace in the legal profession, flat fees will also become a preferable—if not necessary—billing model for firms seeking to balance automation and efficiency with revenue.

- **Lawyers are finding flat fee billing efficiencies:** As flat fee billing models become more popular, lawyers are also getting better at finding efficiencies. In the last few years, the gap between hourly and flat fee realization rates has decreased by about 42%.

### Know what your clients want

- **Clients want to pay by flat fee:** Seventy-one percent of potential clients would prefer to pay a flat fee for their entire case, and 51% would prefer to pay a flat fee for specific activities within their case. However, only 50% of firms offer flat fee billing for an entire case, and 28% allow clients to pay by flat fee for specific tasks on a file.

# How Law Firms Are Failing the Market (and Themselves)



# We've uncovered a critical problem—many lawyers don't show up for clients when they first reach out.

To get clients, law firms need to be keenly aware of where prospective clients are searching for lawyers, what they're looking for, and how to work with them.

But amidst these priorities, we've uncovered a critical problem—many lawyers don't show up for clients when they first reach out. They don't pick up the phone or reply to emails. And, even when lawyers do answer, they don't provide the information that clients need.

This lack of responsiveness was first uncovered in our *2019 Legal Trends Report*. And, when we compared today's lawyer responsiveness with our prior data, we found that the experience of working with the average law firm has gotten worse.

Given this disappointing trend, firms aren't just creating poor customer experiences that inevitably create detractors and drive further disengagement—they're also leaving money on the table. By failing to follow up with prospective clients, firms are missing a massive revenue opportunity and, ultimately, hurting themselves.

As AI grows more commonplace in the legal industry, leveraging tools like chatbots may help firms improve their catastrophically-poor responsiveness and provide, at the very least, a perception of attention to potential clients. Further, our research suggests that firms leveraging technology see better client intake performance, including improved revenue, lead volume, hiring time, and overall conversion rates, underscoring the critical role of technology in supporting modern law firm performance.

## Testing law firm client engagement with our secret shop

We put 500 law firms to the test to determine how well they are meeting the needs of potential clients.

To evaluate the responsiveness and quality of service provided by each firm, we hired a third-party research company to contact each firm with a brief list of questions that a typical potential client might have when deciding whether to hire a lawyer. The questions pertained to a particular legal issue tailored to the firm's practice areas and inquired about topics like cost, process, previous experience, and options for booking a consultation.

# Law firms aren't answering shoppers' emails

In the *2019 Legal Trends Report*, we put law firm responsiveness to the test by emailing a random sample of 1,000 law firms in the United States. The data from this analysis was the first and only primary assessment of law firms of this magnitude and provided strong implications for the state of client services. Of the firms we tested in 2019, 60% did not respond to our emails at all.

With advancements in technology and a growing focus on the importance of client-centered legal services, we expected these results to have improved by 2024. Shockingly, law firms have gotten even worse at replying to emails from prospective clients.

*Sixty-seven percent of law firms we emailed in our 2024 study didn't respond to our emails at all.*

| % OF LAW FIRMS THAT DID NOT RESPOND TO OUR EMAILS | |
| --- | --- |
| 2019 | 2024 |
| 60% | 67% |

Failing to respond to prospective clients by email provides, at best, a frustrating client experience—and assures that clients will look elsewhere for legal services, resulting in lost revenue. And, with such a low bar for responsiveness, firms that prioritize replying could earn a significant competitive advantage in a generally unresponsive market.

**How quickly are law firms responding to client emails?**

While 67% of firms in 2024 didn't respond to our emails, the minority who responded did so quite quickly.

Of the law firms that did respond to customer emails, all responded within two business days—and 84% within eight hours.

**Today's lawyers respond slightly faster to client emails**

2024
2019



82% — RESPONDED WITHIN 8 BUSINESS HOURS — 84%

11% — RESPONDED WITHIN 2 BUSINESS DAYS — 16%

*Sixty-seven percent of law firms we emailed in our 2024 study didn't respond to our emails at all.*



**Potential clients aren't getting the information they need through email**

A quick response doesn't mean much if the email isn't helpful—and compared to our study in 2019, today's firms are much less likely to provide the information that prospective clients are asking for. Only 2% of law firms in 2024 referenced similar legal situations or case law that our shoppers were looking for (compared to 27% of law firms in 2019).



| **100%** | **100%** | **100%** |

| **28%** 2019 | **27%** 2019 | **27%** 2019 |
| **18%** 2024 | **2%** 2024 | **18%** 2024 |

| The law firm provided clear next steps | The law firm referenced similar legal situations | The law firm provided rate information or overall cost |

# Nearly half of law firms aren't answering their phones

In addition to emailing 1,000 law firms to test responsiveness in the *2019 Legal Trends Report*, we also phoned 500 firms. Of the firms we tested in 2019, 56% answered our phone call. In total, 73% of firms either picked up or called us back.

In 2024, firm responsiveness (based on those that either picked up or called back) dropped by nearly *one-third*. Only 40% of firms tested answered our phone call. In total, only 52% of firms either picked up or phoned us back—meaning that we were unable to reach 48%—*nearly half*—of law firms by phone at all.

| % OF LAW FIRMS THAT ANSWERED OUR PHONE CALLS OR PHONED US BACK | |
|---|---|
| 2019 | 2024 |
| 73% | 52% |

## Potential clients aren't getting enough information over the phone

As with emails, law firms aren't providing enough information to prospective clients over the phone compared to 2019.



**100%**

**56%**
2019

**41%**
2024

The law firm provided rate information (hourly or flat fees)

**100%**

**12%**
2024

**9%**
2019

The law firm provided a range for the total cost estimate

**100%**

**50%**
2019

**36%**
2024

The law firm explained the legal process and indicated next steps

## Little gets communicated through voicemail

Today's law firms are also less likely to return calls in response to a voicemail: in 2019, 43% of law firms responded to our voicemails, and in 2024, that number dropped to 20%. Furthermore, 30% of firms that called back did not leave a voicemail (as in, they would simply hang up if we did not answer), which was also greater than in 2019.

*We were* *unable* *to reach 48%* *—NEARLY HALF—* *of law firms by phone.*

# Most shoppers won't recommend the law firms they spoke with

It should be obvious how not responding to potential clients hurts business. However, providing poor client experiences can also result in further missed opportunities. Not only are clients less likely to hire the firm, but they're also less likely to recommend the law firm to others.

Based on the experiences our shoppers had with the law firms they contacted, only a small portion (12%) of shoppers were likely to recommend the firms they contacted to friends or family members.

Those who were able to speak with a firm on the phone had the highest promotion scores among shoppers—more than three times the average across all channels, and nearly eight times more than those who received a follow-up via voicemail.



Shoppers are unlikely to promote law firms

PROMOTERS    PASSIVES    DETRACTORS

| | PHONE (ANSWERED) | CHATBOT | INTAKE FORM | EMAIL | PHONE (VOICEMAIL) | OVERALL |
|---|---|---|---|---|---|---|
| Promoters | 39% | 12% | 10% | 8% | 5% | 12% |
| Passives | 23% | 21% | 9% | 15% | 15% | 15% |
| Detractors | 38% | 67% | 81% | 77% | 80% | 73% |

## *Unresponsive firms create a nearly unanimous negative perception among shoppers*

When it comes to promotion scores, responding in real time can dramatically change firm results. Not getting a response through phone or email left shoppers with an overwhelmingly negative perception of the firm, resulting in nearly all of them being detractors of the firm they reached out to.

More detractors mean more than lost clients—these shoppers are less likely to recommend a firm's services and can actively harm a firm's reputation (for example, by posting negative Google reviews).

The solution? Prioritize responsiveness— pick up the phone and answer shopper queries in a timely manner.



**Lack of response increases the likelihood of detractors**

PROMOTERS     PASSIVES     DETRACTORS

EMAIL (RESPONSE): 19% / 41% / 41%
EMAIL (NO RESPONSE): 2% / 2% / 96%
PHONE (RESPONSE): 39% / 23% / 38%
PHONE (NO RESPONSE): 1% / 9% / 90%

Overall, less than one-third of shoppers found the process of finding law firm information seamless, and even fewer said they received outstanding customer service. Of the communication methods tested, shoppers who reached a firm by phone reported higher overall customer experiences.

However, chatbots also performed comparatively well among shoppers, particularly when helping shoppers understand the step-by-step process of hiring a lawyer and receiving outstanding customer experience. These results highlight the critical role AI could play in helping firms improve their responsiveness—and potential client satisfaction.

# Shoppers have better customer experiences when their phone call is answered

% who agree with each of the following



Phone (answered) **72%**
Chatbot **42%**
Email **22%**
Intake form **26%**
Phone (voicemail) **16%**
Overall **29%**

**I received outstanding customer service**



Phone (answered) **61%**
Chatbot **36%**
Email **25%**
Intake form **23%**
Phone (voicemail) **27%**
Overall **30%**

**I was able to easily understand the step-by-step process of hiring a lawyer**



Phone (answered) **61%**
Chatbot **33%**
Email **24%**
Intake form **24%**
Phone (voicemail) **30%**
Overall **30%**

**I was able to easily understand the step-by-step process of working with a lawyer**



Phone (answered) **32%**
Chatbot **15%**
Email **15%**
Intake form **9%**
Phone (voicemail) **8%**
Overall **14%**

**I was able to easily find pricing information**

# Chatbots: A solution for lawyer unresponsiveness?

*With the power of automation, a chatbot can respond to potential clients within seconds.*

In recent years, chatbots—tools designed to answer basic questions and mimic human conversations through text—have become an increasingly popular method of connecting with both new and existing clients.

Chatbots could solve a rampant problem within the legal profession by improving responsiveness (or, at the very least, providing a perception of responsiveness). With the power of automation, a chatbot can respond to potential clients within seconds and minimize the time a potential client spends waiting for a response.

However, despite widespread AI use throughout the legal profession, only 7% of law firms use chatbots on their website. Similarly, 7% of lawyers believe that clients would prefer to communicate with law firms via chatbot.

**How do clients feel about law firm chatbots?**

While chatbots present the potential for law firms to increase responsiveness and manage client queries, most potential clients want to speak with a human lawyer at the end of the day.

One in six potential clients has used an AI-powered chatbot to obtain answers to legal questions in the past.

*Generational differences: Understanding what your clients want*

Understanding generational preferences can help law firms build trust and satisfaction among their client base. For example, Gen Z prospective clients are more likely (34%) than Millennials (25%), Gen Z (9%), and Baby Boomers (4%) to have used AI-powered chatbots to connect with legal resources. Thus, law firms that typically serve a younger client base may be better positioned to adopt client-facing AI tools, such as chatbots.

Potential clients see the value of chatbots—but only to a certain point. Fifty-one percent of prospective clients agreed that chatbots can be a useful starting point for exploring legal options, and over half were comfortable using a chatbot to get answers to simple legal questions.

Ultimately, potential clients want to speak to a human regarding their legal matter. Most potential clients believe that chatbots are not equipped to handle complex legal issues and are less reliable than human legal representatives. Further, three in five potential clients said they would only use a chatbot if they could switch to a human if needed.

## Potential clients see the value of chatbots, but still want to speak to a lawyer

 = 5%

I would only use a chatbot if I could switch to a human if needed

**61%**

Chatbots are not equipped to handle complex legal issues

**61%**

Chatbots are less reliable than human legal representatives

**59%**

Chatbots can be a useful starting point for exploring legal options

**51%**

Chatbots can provide accurate answers to basic legal questions

**43%**

While most potential clients want to speak with a human lawyer at the end of the day, AI—in particular, chatbots—presents significant potential for law firms to increase responsiveness and attract new clients.

## *Firm-to-firm referrals are an untapped opportunity*

Thirty-five percent of law firms claim that referrals from other legal professionals generate the most potential client leads. Thus, cultivating relationships with other firms can provide significant opportunities to generate new clients.

However, law firms aren't great at passing referrals on when they are unable to help a potential client. Only 13% of potential clients received a referral to a different law firm or someone else within the same law firm.

The upside of cultivating these referral relationships with other law firms is that they help clients find the help they need, and they also increase the chances of firms getting business back from the clients they refer out. On the other hand, when a client doesn't get any response from the firm they are referred to, those relationships break down.

# Law firm websites don't provide the information that clients need

According to legal professionals, their law firm's website is one of the most-used channels for promoting their services: 74% of surveyed lawyers currently use their firm website to promote or market their services to potential clients.

However, potential clients can't find the information they're looking for on law firm websites. While the majority of shoppers could find contact information on the law firm's website, they struggled to understand the step-by-step process of hiring or working with a lawyer or to find any pricing information.

**Prospective clients aren't having a seamless experience when searching for law firms**



84% I was able to easily find contact information on the law firm's website

36% The process of finding a lawyer was seamless

30% I was able to easily understand the process of hiring a lawyer

29% I received outstanding customer service

14% I was able to easily find pricing information

## What are prospective clients looking for on law firm websites—and are they finding it?

According to prospective clients, a lawyer's experience with similar cases is one of the top three factors that matter most when choosing who to hire.

Here, many lawyers are giving prospective clients what they need to make an informed decision. Eighty-six percent of prospective clients agreed that it is easy to find information on the types of cases a law firm deals with on their website.

### What's important to clients when choosing a lawyer?

% who consider each a top 3 priority for clients hiring a lawyer      ○ Clients   ○ Legal professionals

| | Legal professionals | Clients |
|---|---|---|
| Has experience with similar cases | 43% | 50% |
| Is a reputable law firm | 39% | 41% |
| Has positive client reviews | 31% | 34% |
| Offers a fixed / flat rate | 15% | 18% |
| Offers a competitive hourly rate | 15% | 23% |

However, when it comes to other important considerations, such as pricing or pricing models, many firms have room for improvement.

## What prospective clients are looking for on law firm websites

● What clients look for
● What clients can find



10% — COST INFO — 59%

11% — PRICING MODEL — 48%

So, while law firms are using their websites to promote their services, they may not be doing it in a way that helps prospective clients as much as they could. Understanding what clients are looking for—and giving it to them—can go a long way in improving the client experience.

These concerns present a unique challenge for law firms. On the one hand, firms may be hesitant to provide detailed information on pricing and the process of hiring or working with their lawyers up front due to the complexity and variability of their services.

On the other hand, providing more information upfront—before a potential client contacts a law firm—could offer a competitive advantage. If potential clients have the information they need from a simple glance at a law firm's website, it could make all the difference in which law firm they choose to contact.

# Intake solutions to improve client experiences

One clear solution for improving the client experience is leveraging technology, including AI features like chatbots.

To further support law firms in providing better client services, we looked at several technologies designed to enhance a firm's ability to respond to clients when they reach out—and how these capabilities can improve key areas of business performance.

Previously, we conducted an analysis in 2020 that showed how law firms using a dedicated client intake software—Clio Grow—saw as much as 20% more cases and earned 26% more revenue than law firms not using the software.

This year, we've looked deeper into how certain capabilities within Clio Grow can support law firms across several important business metrics, including:

- Revenue generation

- Lead volume

- Time to hire

- Conversion

## Business levers for improving client intake

We looked at features in Clio Grow that were associated with improved client intake:

▶ *E-signatures:* This feature helps law firms automate document signing and sending with easy, fast e-signatures on legal documents and agreements.

▶ *Online search ads:* This feature allows law firms to create and manage online search advertisements from Clio Grow.

▶ *Online schedulers:* This feature is an online appointment booking tool for prospective clients.

▶ *Online intake forms:* This feature allows law firms to collect client and case information electronically, so that it is automatically captured within Clio Grow.

▶ *Text messaging:* This feature allows law firms to send and receive text messages and reminders with clients through Clio Grow.

## Firms that use technology to improve client experiences see more client leads and higher revenues

We looked at Clio Grow users who use the software to enhance the experience of reaching out to a law firm. We found that firms using these client-facing capabilities saw 51% more client leads—meaning they were able to connect with more potential clients overall—and 52% higher revenues.

Client-facing technologies that improve client experiences:

- **Online schedulers** let potential clients book initial meetings right away online without having to reach out by phone or email, virtually eliminating the need for any back-and-forth communications—and the need for firms to pick up the phone or respond to emails.

- **Online search ads** show a law firm's business profile in Google when potential clients use relevant search terms within the firm's local area, making it especially easy to discover and learn about the firm.

- **Online intake forms** let potential clients submit their information electronically through a link that can be accessed publicly on a law firm's website, helping reduce friction or drop-off during intake.

**Firms using technology—namely, online schedulers, online search ads, and online intake forms—to enhance client experiences have**



**51%** More client leads



**52%** More revenue

## Key features associated with better conversion rates

As a dedicated intake system, Clio Grow allows a firm to log information for potential clients so that it has a record of everyone who reaches out. The information gathered during the pre-intake and intake stages can then be transferred to the client's case files if and when they decide to retain the firm.

Firms with higher conversion rates are those that see a higher proportion of their potential clients *convert* to actual clients. On the other hand, firms with lower conversion rates end up with more lost opportunities—and more wasted time speaking with those who don't end up actually hiring the firm.

Several features—including e-signatures, shared intake forms, and text messaging—had modest correlations with higher conversion rates, suggesting that these features can support firms in their efforts to get hired by clients.

## Difference in conversion rate

% difference between those using and not using each feature in Clio Grow



## Key technologies associated with quicker hiring times

The time it takes to get hired by a potential client who reaches out to the firm is an important metric, because the longer it takes, the greater the chance the potential client will abandon their legal problem or find another law firm.

Online search ads are a standout feature here, suggesting that clients who discover a law firm through search ads are quicker to be retained. Firms using e-signatures also appear to get hired quicker, as they are likely to have electronic engagement forms readily available within the intake process. E-signatures also reduce the delays in sharing and returning documents—once signed, they are immediately updated within the firm's intake system.

# Difference in time to hire

% difference between those using and not using each feature in Clio Grow



| E-signatures | Online search ads | Online schedulers | Online intake forms | Text messaging |
|---|---|---|---|---|
| 24% | 25% | 7% | 8% | -1% |

0%

# Turning prospects into clients

Overall, based on our research, the experiences that firms offer their potential clients have degraded over the past few years—but it doesn't have to be that way. As technology advances and client expectations evolve, law firms must prioritize client engagement strategies—focusing on responsiveness and availability of information—to stay competitive.

While chatbots can help, from a client perspective, they aren't a complete substitute for meaningful human interaction. By striking a balance between automation and personal interactions, firms may be able to improve their interactions with prospective clients.

However, addressing client responsiveness isn't just about picking up the phone or answering an email. To provide the best possible experience for prospective clients, firms should rethink their entire client onboarding process. By leveraging tools like e-signatures, intake forms, scheduling, and more, law firms can streamline the client onboarding process and further improve client satisfaction while also boosting performance in other key areas, like monthly revenue.

## Law firms need to focus on responsiveness

- **Answer the call:** Today's shoppers report the highest levels of law firm satisfaction when they can speak with a lawyer on the phone. Improving phone responsiveness—whether by focusing on availability or putting processes in place to ensure callers are able to connect with staff—can help law firms set themselves apart.

- **Leverage artificial intelligence:** Prospective clients report comparatively high levels of satisfaction when engaging with AI tools, like chatbots. These tools can also help with responsiveness by providing information immediately— and enhancing the perception of availability. Consider leveraging chatbots to help improve responsiveness and client satisfaction—but remember that shoppers do not see chatbots as a complete substitute and expect they will eventually connect with law firm staff.

## Clients are looking for more information

- **Give clients the information they want:** Clients are looking for information on law firm websites but are not finding it. In particular, clients want to see more information on fees and the step-by-step process of engaging with lawyers. Law firms should, therefore, consider whether they wish to disclose more information on their websites to help prospective clients navigate the process of selecting a lawyer.

- **Help clients with their queries:** Many clients feel they aren't getting enough information when they initially speak with a law firm. Here, it's worth determining what information should be disclosed at the initial contact stage and ensuring all staff members are aligned to provide adequate information for prospective clients.

## Clio Grow features can help firms with revenue, conversion, and much more

- **Leverage client intake features to improve performance:** Clio Grow features offer significant improvements in monthly revenue, lead volume, time to hire, and conversion rates.

# How Law Firms Spend for Growth



How firms invest in themselves ultimately shapes their future growth and success. Spending decisions, whether about what to invest in or how much to invest, can set the foundation for sustained growth and competitive advantage—or hold firms back from reaching their full potential.

Understanding law firm spending habits is important for more than budget management—it can also help firms determine whether investments are leading to improved efficiency and client satisfaction so they can allocate resources accordingly. By determining where money is being spent and whether law firm investments are translating to improved performance, law firms can make informed decisions that support their growth and long-term success.

# Where are law firms spending their money?

For the average law firm, staff salaries are the largest expense, making up 38% of total costs. In other words, firms pay close to half of their expenses to their people. Otherwise, office expenses and rent—money spent to keep the lights on—typically make up a combined 14% of spending.

## Where are law firms spending their money?



Other expenses: 27%

Software: 2%

Insurance: 4%

Professional fees: 5%

Marketing: 5%

Staff salaries: 38%

Rent: 7%

Office expenses: 7%

*Understanding law firm spending habits can help firms understand whether investments are leading to improved efficiency and client satisfaction.*

## Growth trends in law firm spending

Law firm spending has been increasing across the board since 2012—and outpacing the average inflation rate of 2.6% over the same period.



**Growth rates for law firm spending since 2012**

21% — Software
12% — Professional fees
11% — Insurance
8% — Staff salaries
8% — Marketing
6% — Office expenses
6% — Rent

COMPOUND ANNUAL GROWTH RATE (CAGR) PER EXPENSE

Investments in software and professional fees are the highest law firm spending growth areas. Their comparatively high growth rates suggest that firms are focusing their attention on these areas.

There could be a number of reasons—both internal and external—for this growth. For example, professional fees could be growing due to external factors (such as increased professional fees) or firms prioritizing professional development.

In any event, high growth rates for software and professional fees could indicate that law firm spending trends will continue to shift as time goes on, with a higher percentage of overall resources being allocated to these expenses.

Perhaps unsurprisingly, rent and office expenses are comparatively lower growth areas, possibly due to the ongoing focus on remote and hybrid working arrangements following the COVID-19 pandemic.



# Law firm spending on software and marketing is growing

While all law firm expenses have increased over time, two areas in particular are experiencing notable growth: software and marketing spend.

**Though still a relatively small portion of expenses, firm software spend has grown rapidly**

While firms only spend 2% of their expenses on software on average, this expense has increased by 21% every year since 2012, making software the fastest-growing law firm expense.

The growth in software spending has surpassed growth in revenues, which averaged 9% each year over the same period. This suggests that law firms are shifting more of their resources towards technology to enhance efficiency and scalability.



Total U.S. law firm advertising and software spend vs. revenue

Source: Service Annual Survey, U.S. Census Bureau

*Projected values

*Solo lawyers dramatically underspend on software compared to other firms, but are catching up*

Firm size appears to have a bearing on software spend. Solo lawyers spend the least, at 0.58% of their expenses, while small firms (2–4 lawyers) spend 1.77%. Firms with 5–19 employees spend 1.37% of their expenses on software, while firms with 20 or more employees spend 1.6%.

These results are particularly surprising given solo law firms' comparative lack of resources. Without the staff and tools available to larger firms, solos who fail to spend to catch up risk being left behind.

Despite spending the lowest proportion of their expenses on software, solos are making up for it: software spend among solo lawyers is growing at an astounding 56% (or more than twice the industry rate).

In other words, more than any other, solo lawyers increasingly recognize the importance of technology in legal practice. It could also indicate that—through technology—solo and small firms are realizing the importance of increasing their ability to compete with larger firms in their efficiency and service.

# How much do firms spend on software?

% of total law firm spending



| | |
|---|---|
| **1.60%** | 20+ employee firms |
| **1.37%** | 5–19 employee firms |
| **1.77%** | 2–4 employee firms |
| **0.58%** | Solo lawyers |

**Marketing spend is growing rapidly among law firms**

The average law firm spends roughly 5% of their overall expenses on marketing. However, this expense is growing at a yearly rate of 8%.

*Solo lawyers spend more on marketing, but their expenses aren't growing*

Solo lawyers spend nearly twice the industry average on marketing at 9%. However, they aren't spending more on marketing over time— growth in marketing spend for solo lawyers is much slower than the average spend at 3%.

Solo lawyers may invest heavily in marketing when starting out to build a client base, but they may not have the financial flexibility to continually increase their marketing spend.

# Investments in software and marketing pay off

*Firms that invest more in software and marketing have utilization rates above the industry average of 37%—which amounts to just under three hours of billable hours per day—and they also earn much higher profit margins.*

When we look at the spending habits of firms with exceptionally high performance in key areas, we can uncover the spending decisions that are associated with higher law firm performance.

Based on recent data, firms that invest more in software and marketing have utilization rates above the industry average of 37%—which amounts to just under three hours of billable hours per day—and they also earn much higher profit margins.

**FIRMS WITH ABOVE-AVERAGE PRODUCTIVITY:**

Spend 12% more on software

Spend 41% more on marketing

Earn 21% more in profitability

# Which technologies do firms spend the most on?

Legal professionals report using a variety of software tools in their day-to-day work, ranging from client intake tools to billing software—and everything in between.

## Tech adoption among legal professionals

% of legal professionals who use each

| % | Tool |
|---|------|
| 67% | Cloud-based data storage tool |
| 64% | Video conferencing platform |
| 61% | Electronic signature tool |
| 59% | Cloud-based practice management software |
| 58% | Online or electronic payments tool |
| 58% | Electronic filing |
| 50% | Accounting software |
| 38% | Client intake or customer relationship management (CRM) system |
| 29% | Website design tool |
| 29% | Document automation tool |
| 27% | Generative AI tool |
| 22% | Email scheduling tool |
| 12% | Virtual receptionist |
| 10% | Non-cloud-based practice management software |

The top software tools that law firms report using are cloud-based data storage tools (67%), followed by video conferencing platforms (64%) and electronic signature tools (61%). Fifty-nine percent of respondents use cloud-based practice management software and 27% report using a generative AI tool.

If firms continue to increase their spending on technology each year, we'll likely see more adoption of AI. Over four in five firms believe that AI usage will increase in the next 12 months. To learn more, read *"AI Is Disrupting the Legal Industry."*

*Lowering expenses and increasing revenue are motivating factors for tech adoption*

When asked what the most important considerations are when adopting new technology or tools for their firm, 29% of legal professionals said that the technology or tool should increase their firm's revenue and save their firm money.

While many firms spend more on software over time, they may be doing so in the pursuit of their long-term goals. By investing heavily in technology and tools now, legal professionals hope to set their firms up for savings—and increased revenue—down the line thanks to the increased efficiencies offered by many of today's tech options.

# Marketing preferences among legal professionals

Despite spending a significant portion of their expenses on marketing, referrals are the greatest source of potential clients, followed closely by company websites. Online reviews, social media, and internet searches are also top options for marketing to potential clients.

*Clio Grow offers endless opportunities for marketing your practice across numerous channels.*

For example, with Clio Grow's website builder, you can set up a professional website for your law firm without having to learn how to design or code. You can also leverage internet searches with Google's Local Services Ads for Clio, an effective and straightforward tool to advertise your firm on Google. Finally, Clio Grow's client intake software makes it easy for prospective clients to find and book an appointment with you online.

Learn more about Clio Grow.

## How are lawyers marketing their services to potential clients?

% of legal professionals who have used each of the following



| Channel | % |
|---|---|
| Referrals | 75% |
| Company website | 74% |
| Online reviews | 57% |
| Social media | 50% |
| Internet search/SEO optimization consultants | 45% |
| Online business directories | 45% |
| Online blogs | 35% |
| Web ads | 32% |
| Client-attended conferences or trade shows | 31% |
| Print advertisements | 28% |
| Paid lead referral services | 26% |
| Online video advertisements | 25% |
| Locally placed ads | 22% |
| Podcast or digital audio ads | 21% |
| TV as | 18% |
| Radio ads | 15% |
| Other | 3% |





# Where should your law firm's money go?

New advancements in technology—and AI in particular—stand to have a dramatic influence on efficiency and success in law firms. Understanding where and how to allocate resources will become increasingly important. While traditional expenses like salaries and rent still take up the bulk of law firm expenses, firms are spending more on software and marketing—two strategic investment areas that play a critical role in driving firm growth.

Furthermore, lawyers who prioritize spending in these areas may be better positioned for long-term success, as demonstrated by the benefits enjoyed by firms who spend more in these areas.

## AI will change how legal professionals prioritize expenses

- **Plan for your software expenses to grow over time:** While firms spend a comparatively small proportion of their expenses on software, this category is the fastest-growing law firm expense.

- **Today's investments are tomorrow's efficiencies:** Software spend has continuously exceeded revenue growth in law firms—however, this short-term disparity may be part of a long-term strategy. By investing heavily in technology and tools now, legal professionals can set their firms up for long-term success thanks to the increased efficiencies offered by a comprehensive tech stack.

- **Adopt AI to stay competitive:** With the vast majority of law firms already leveraging AI, those that have not invested in AI tools may soon find themselves outpaced by AI-enabled legal service providers.

## Not all expenses have the same payoff

- **Look to high-performing firms for guidance on prioritizing expenses:** High-performing firms spend more on software and marketing, two key areas that can help firms grow their businesses while increasing efficiencies.

- **Get granular when assessing your firm's expenses:** Carefully consider the potential return on investment of discretionary expenses.



# Hourly Rates and Key Performance Indicators

Each *Legal Trends Report* includes data on average hourly rates and key performance indicators (KPIs) to help analyze lawyer and law firm productivity, efficiency, and revenue generation.

## Key performance indicators

Clio's law firm KPIs provide benchmark insights into how law practices are performing over time, giving firms insight into how to measure and improve their performance. They include:

- **Utilization rate:** the percentage of an eight-hour day that gets put towards billable work.

- **Realization rate:** the percentage of billable work that gets invoiced to clients.

- **Collection rate:** the percentage of invoiced work that gets paid.



### Key performance indicators

### The lawyer's funnel in 2024



Hourly breakdown of firm revenue          8 hour work day



## Utilization, realization and collection rates by state

| State | Utilization rate | | Realization rate | Collection rate | State | Utilization rate | | Realization rate | Collection rate |
|---|---|---|---|---|---|---|---|---|---|
| | Lawyer | Non-lawyer | Firm | Firm | | Lawyer | Non-lawyer | Firm | Firm |
| ALABAMA | 37% | 22% | 86% | 93% | MONTANA | 40% | 22% | 89% | 96% |
| ALASKA | 36% | 28% | 93% | 95% | NORTH CAROLINA | 42% | 27% | 85% | 93% |
| ARIZONA | 34% | 26% | 87% | 92% | NORTH DAKOTA | 35% | 28% | 88% | 94% |
| ARKANSAS | 27% | 16% | 86% | 88% | NEBRASKA | 25% | 16% | 89% | 94% |
| CALIFORNIA | 34% | 29% | 81% | 93% | NEW HAMPSHIRE | 35% | 24% | 83% | 91% |
| COLORADO | 36% | 27% | 94% | 95% | NEW JERSEY | 37% | 26% | 92% | 95% |
| CONNECTICUT | 29% | 21% | 80% | 93% | NEW MEXICO | 32% | 23% | 82% | 92% |
| DELAWARE | 35% | 22% | 91% | 96% | NEVADA | 31% | 21% | 89% | 92% |
| DISTRICT OF COLUMBIA | 28% | 28% | 80% | 96% | NEW YORK | 34% | 18% | 95% | 91% |
| FLORIDA | 34% | 25% | 79% | 92% | OHIO | 32% | 20% | 88% | 90% |
| GEORGIA | 31% | 23% | 84% | 91% | OKLAHOMA | 36% | 20% | 88% | 92% |
| HAWAII | 35% | 24% | 91% | 96% | OREGON | 35% | 23% | 90% | 94% |
| IDAHO | 38% | 17% | 95% | 93% | PENNSYLVANIA | 36% | 21% | 85% | 93% |
| ILLINOIS | 35% | 23% | 86% | 93% | RHODE ISLAND | 42% | 19% | 87% | 96% |
| INDIANA | 33% | 16% | 83% | 90% | SOUTH CAROLINA | 33% | 24% | 91% | 92% |
| IOWA | 35% | 21% | 81% | 94% | SOUTH DAKOTA | 39% | 16% | 89% | 95% |
| KANSAS | 34% | 18% | 90% | 94% | TENNESSEE | 31% | 20% | 83% | 90% |
| KENTUCKY | 33% | 16% | 90% | 93% | TEXAS | 34% | 27% | 89% | 93% |
| LOUISIANA | 33% | 21% | 81% | 93% | UTAH | 38% | 25% | 94% | 96% |
| MAINE | 37% | 16% | 89% | 95% | VERMONT | 31% | 18% | 94% | 96% |
| MARYLAND | 32% | 21% | 88% | 93% | VIRGINIA | 30% | 20% | 89% | 94% |
| MASSACHUSETTS | 32% | 24% | 78% | 91% | WASHINGTON | 34% | 26% | 92% | 94% |
| MICHIGAN | 34% | 24% | 90% | 93% | WEST VIRGINIA | 35% | 16% | 74% | 86% |
| MINNESOTA | 30% | 19% | 88% | 93% | WISCONSIN | 39% | 20% | 91% | 95% |
| MISSISSIPPI | 32% | 22% | 87% | 87% | WYOMING | 30% | 18% | 95% | 95% |
| MISSOURI | 33% | 19% | 85% | 92% | | | | | |

## Lockup

Lockup consists of three measures within the billing process and is measured in days:

- **Realization lockup:** This is the amount of revenue that is unbilled at any given time (also known as "work-in-progress lockup").

- **Collection lockup:** This is the amount of revenue that is uncollected at any given time (also known as "debtor lockup").

- **Total lockup:** This is a combination of revenue held in both realization and collection lockup.

**Lockup days (12 month rolling revenue)**   ■ Total lockup   ■ Realization lockup   ■ Collection lockup



## Legal productivity index



## Hourly rates in legal



*"Non-lawyers" are non-licensed legal professionals (such as paralegals) who contribute billable time to their firms; "Law firms" is a blended rate of lawyers and non-lawyers; and "CPI" is the Consumer Price Index.*

# Hourly and adjusted hourly rates by state

*Adjusted rates reflect cost of living for each state.

| State | Hourly rates | | | Adjusted hourly rates | | | State | Hourly rates | | | Adjusted hourly rates | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lawyer | Non-lawyer | Firm | Lawyer | Non-lawyer | Firm | | Lawyer | Non-lawyer | Firm | Lawyer | Non-lawyer | Firm |
| ALABAMA | $246 | $143 | $233 | $280 | $163 | $265 | MONTANA | $234 | $132 | $220 | $260 | $146 | $243 |
| ALASKA | $300 | $178 | $272 | $294 | $175 | $267 | NORTH CAROLINA | $295 | $158 | $271 | $313 | $168 | $288 |
| ARIZONA | $287 | $168 | $261 | $287 | $168 | $261 | NORTH DAKOTA | $285 | $180 | $266 | $322 | $203 | $300 |
| ARKANSAS | $271 | $144 | $252 | $313 | $167 | $291 | NEBRASKA | $256 | $230 | $251 | $285 | $257 | $279 |
| CALIFORNIA | $391 | $234 | $360 | $348 | $208 | $320 | NEW HAMPSHIRE | $294 | $206 | $281 | $274 | $191 | $262 |
| COLORADO | $302 | $169 | $279 | $295 | $165 | $272 | NEW JERSEY | $348 | $194 | $329 | $319 | $178 | $302 |
| CONNECTICUT | $384 | $209 | $347 | $361 | $197 | $327 | NEW MEXICO | $261 | $143 | $237 | $287 | $157 | $261 |
| DELAWARE | $423 | $201 | $391 | $432 | $206 | $399 | NEVADA | $330 | $181 | $301 | $343 | $188 | $312 |
| DISTRICT OF COLUMBIA | $462 | $207 | $427 | $409 | $184 | $378 | NEW YORK | $398 | $223 | $374 | $370 | $207 | $348 |
| FLORIDA | $335 | $183 | $304 | $328 | $179 | $298 | OHIO | $268 | $181 | $255 | $293 | $198 | $279 |
| GEORGIA | $340 | $193 | $315 | $355 | $202 | $328 | OKLAHOMA | $257 | $131 | $242 | $289 | $147 | $272 |
| HAWAII | $312 | $164 | $293 | $282 | $148 | $265 | OREGON | $296 | $150 | $267 | $277 | $141 | $250 |
| IDAHO | $267 | $141 | $249 | $291 | $153 | $271 | PENNSYLVANIA | $302 | $197 | $288 | $314 | $204 | $299 |
| ILLINOIS | $349 | $200 | $328 | $345 | $197 | $324 | RHODE ISLAND | $317 | $184 | $303 | $303 | $176 | $290 |
| INDIANA | $278 | $174 | $264 | $303 | $189 | $288 | SOUTH CAROLINA | $287 | $139 | $256 | $306 | $148 | $273 |
| IOWA | $254 | $166 | $241 | $287 | $188 | $273 | SOUTH DAKOTA | $245 | $154 | $237 | $279 | $175 | $270 |
| KANSAS | $292 | $168 | $277 | $324 | $187 | $308 | TENNESSEE | $281 | $149 | $260 | $306 | $162 | $283 |
| KENTUCKY | $236 | $158 | $227 | $265 | $177 | $254 | TEXAS | $345 | $177 | $308 | $354 | $182 | $316 |
| LOUISIANA | $266 | $113 | $244 | $293 | $125 | $270 | UTAH | $291 | $160 | $271 | $308 | $169 | $287 |
| MAINE | $236 | $181 | $229 | $234 | $179 | $227 | VERMONT | $267 | $145 | $251 | $264 | $143 | $248 |
| MARYLAND | $344 | $214 | $322 | $327 | $204 | $306 | VIRGINIA | $351 | $199 | $327 | $344 | $195 | $321 |
| MASSACHUSETTS | $318 | $249 | $305 | $290 | $228 | $279 | WASHINGTON | $322 | $173 | $290 | $293 | $157 | $264 |
| MICHIGAN | $294 | $138 | $269 | $315 | $148 | $288 | WEST VIRGINIA | $195 | $158 | $192 | $219 | $177 | $215 |
| MINNESOTA | $305 | $162 | $283 | $312 | $166 | $290 | WISCONSIN | $278 | $197 | $269 | $302 | $213 | $291 |
| MISSISSIPPI | $242 | $158 | $228 | $277 | $181 | $261 | WYOMING | $290 | $128 | $266 | $315 | $139 | $289 |
| MISSOURI | $280 | $154 | $262 | $307 | $169 | $288 | | | | | | | |

## Hourly rates by practice area

| Practice area | Lawyer | Non-lawyer | Firm | Practice area | Lawyer | Non-lawyer | Firm |
|---|---|---|---|---|---|---|---|
| ADMINISTRATIVE | $311 | $140 | $257 | GOVERNMENT | $259 | $187 | $254 |
| APPELLATE | $309 | $192 | $297 | IMMIGRATION | $394 | $316 | $357 |
| BANKRUPTCY | $439 | $214 | $391 | INSURANCE | $243 | $123 | $229 |
| BUSINESS | $346 | $186 | $330 | INTELLECTUAL PROPERTY | $414 | $264 | $393 |
| CIVIL LITIGATION | $327 | $162 | $305 | JUVENILE | $136 | $187 | $138 |
| CIVIL RIGHTS/ CONSTITUTIONAL LAW | $330 | $150 | $300 | MEDIATION/ ARBITRATION | $338 | $142 | $318 |
| COLLECTIONS | $320 | $192 | $286 | MEDICAL MALPRACTICE | $238 | $121 | $208 |
| COMMERCIAL/ SALE OF GOODS | $365 | $183 | $347 | PERSONAL INJURY | $309 | $161 | $271 |
| CONSTRUCTION | $277 | $133 | $248 | REAL ESTATE | $354 | $193 | $335 |
| CONTRACTS | $341 | $183 | $327 | SMALL CLAIMS | $209 | $122 | $202 |
| CORPORATE | $407 | $213 | $388 | TAX | $382 | $239 | $350 |
| CRIMINAL | $216 | $202 | $215 | TRAFFIC OFFENSES | $300 | $348 | $305 |
| ELDER LAW | $320 | $195 | $291 | TRUSTS | $380 | $201 | $333 |
| EMPLOYMENT/ LABOR | $362 | $169 | $335 | WILLS & ESTATES | $351 | $196 | $313 |
| FAMILY | $314 | $168 | $283 | WORKER'S COMPENSATION | $177 | $131 | $169 |

# App data collection

The *Legal Trends Report* uses aggregated and anonymized data collected from the Clio platform. By synthesizing actual usage data, we're able to identify trends that would be otherwise invisible to most firms.

The *Legal Trends Report* has been prepared using data aggregated and anonymized from tens of thousands of legal professionals. These customers were included in our dataset using the following criteria:

- They were paid subscribers to Clio. Customers who were evaluating the product via a free trial or were using Clio as part of our Academic Access Program were not included.
- They utilized Clio services hosted within the United States data centers.
- Any data from customers who opted out of aggregate reporting was excluded.
- Outlier detection measures were implemented to systematically remove statistical anomalies.

## Data usage and privacy

The security and privacy of customer data is our top priority at Clio. In preparing the *Legal Trends Report,* Clio's data operations team observed the highest standard of data collection and reporting.

## Data collection

- All data insights were obtained in strict accordance with Clio's Terms of Service (section 2.12).
- All extracted data was aggregated and anonymized.
- No personally identifiable information was used.
- No data belonging to any law firm's clients was used.

## Reporting

Aggregate data has been generalized where necessary to avoid instances where individual firm data could be identified. For example, to avoid reporting data on a small

town with only one law firm, which would implicate all of this town's data to this firm, we only report at country, state, and metropolitan levels.

Additionally, raw datasets will never be shared externally. Clio is effectively a tally counter for user interactions—much like stadiums use turnstiles to count visitors without collecting any personally-identifiable information from their customers. Similarly, as users interact with the Clio platform they trigger usage signals we can count and aggregate into datasets. We can identify trends without collecting information that reveals anything specific about individual customers.

# Secret shop data collection

Clio partnered with market research agency Lux to conduct a Secret Shop study, which aimed to evaluate law firm performance on digital and traditional channels. Secret shops of 500 law firms were conducted from June 20 to July 5, 2024.

Each Secret Shop included:

- A validation survey
- A 30-minute virtual shopping experience
- A post-mission survey

Participant shoppers were qualified using the following criteria:

- They were recruited by Lux
- They were 18 years of age or older
- They resided in the United States

Shoppers contacted law firms, grouped as Clio users and non-Clio users, that were qualified using the following criteria:

- They were located in the United States

## Reporting

Aggregate survey data has been generalized, where necessary, to avoid instances where individual firm data could be identified.



The *Legal Trends Report*, published by Clio, provides information on the most important issues faced within the legal profession. By analyzing aggregated and anonymized data from tens of thousands of legal professionals in the U.S., supported by extensive survey research, this report offers unique insights into law firm efficiencies, hourly rates, and other key metrics for success.

Clio is the world's leading provider of cloud-based legal technology, providing lawyers with low-barrier, affordable solutions to manage and grow their firms more effectively, more profitably, and with better client experiences. Clio redefines how lawyers manage their firms by helping them run their practices securely from any device, anywhere.

Learn more at clio.com.



Legal Trends Report® is a registered trademark of Themis Solutions Inc.
© 2024 Themis Solutions Inc. All rights reserved.